**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JANE DOES NOS. 1-13,<br><br>        Plaintiffs,<br><br><br>    v.<br><br>PETER J. NYGARD, NYGARD INC., NYGARD INTERNATIONAL PARTNERSHIP, NYGARD INTERNATIONAL, INC., NYGARD HOLDINGS LIMITED, TAN JAY INTERNATIONAL LTD, NYGARD HOLDINGS (USA) LIMITED, NYGARD NY RETAIL, LLC, NYGARD PARTNERS, LLC, NYGARD PROPERTIES LTD., NYGARD ENTERPRISES LTD., NYGARD ENTERPRISES LLC, NYGARD CAPITAL INC., NYGARD COMPANY LLC, NYGARD BIOTEC CORP., NYGARD VENTURES, INC., FASHION VENTURES INC., 4093887 CANADA INC., 4093879 CANADA INC., 13700 SATICOY LLC, BRAUSE INVESTMENTS LTD., EDSON'S INVESTMENTS LTD., NBH, LLC, DRAGYN INDUSTRIES LLC, ORION ASSET MANAGEMENT, INC., 9450 TOPANGA PROPERTIES, LLC, 14702 SOUTH MAPLE STREET, LLC, STARWOOD HOTELS AND RESORTS WORLDWIDE, INC., D/B/A THE W NEW YORK – TIMES SQUARE, GREGORY ALAN FENSKE, TIINA TULIKORPI, DAVID PATON, SCARLET NYGARD SZCZEPANIAK, JAMES BENNETT.<br><br>        Defendants. | Case No.<br><br><br><br>**JURY TRIAL DEMANDED** |

**<u>COMPLAINT</u>**

## INTRODUCTION

1.     On December 15, 2020, the Department of Justice ("DOJ") indicted Peter Nygard ("Nygard") for spearheading a decades-long racketeering enterprise and sex trafficking venture, enabled by myriad accomplices and co-conspirators. *See United States v. Nygard*, No. 20 CR 624 (S.D.N.Y.) ("DOJ Indictment") (annexed as Exhibit 1).

2.     According to the FBI investigation, "Nygard's criminal conduct has affected hundreds of victims." *See* the "Canadian Extradition Arrest Warrant."

3.     The purpose of Nygard's trafficking enterprise is to "recruit, entice, transport, harbor, and maintain adult and minor-aged female victims for Nygard's sexual gratification," including through the use of "force, fraud, and coercion to cause women to engage in commercial sex with Nygard and others." *See* Ex. 1 at ¶ 3.

4.     Defendants, including the Defendant corporate entities that were the alter egos for Peter J. Nygard, "used fraud, force and coercion to cause at least dozens of adult and minor-aged female victims to engage in commercial sex by recruiting, enticing, transporting, harboring, and maintaining adult and minor-aged female victims for Nygard's sexual gratification and, on occasion, the gratification of Nygard's personal friends and business associates." *Id.* at ¶ 11.

5.     "Other victims were forcibly assaulted by Nygard's associates or drugged to ensure their compliance with Nygard's sexual demands." *Id.* at ¶ 12. The Nygard Companies[1] were the

---

[1] The phrase "the Nygard Companies" means and includes Nygard Inc., Nygard International Partnership, Nygard International, Inc., Nygard Holdings Limited, Tan Jay International Limited, Nygard Holdings (USA) Limited, Nygard NY Retail, LLC, Nygard Partners, LLC, Nygard Properties Ltd., Nygard Enterprises Ltd., Nygard Enterprises LLC, Nygard Capital Inc., Nygard Company LLC, Nygard Biotec Corp., Nygard Ventures, Inc., Fashion Ventures Inc., 4093887 Canada Inc., 4093879 Canada Inc., 13700 Saticoy LLC, Brause Investments Ltd., Edson's Investments Ltd., Dragyn Industries LLC, Orion Asset Management, Inc., 9450 Topanga Properties, LLC, 14702 South Maple Street, LLC, and NBH, LLC.

alter egos for Peter J. Nygard and paid for and benefited from the sex trafficking network, including the scheme to coerce or force commercial sex acts. *Id.* at ¶ 16.

6.      "To recruit victims, Peter Nygard, the defendant, and others known and unknown, used a network of trusted associates; 'girlfriends' and Nygard Group employees. Many of the victims were initially invited to dinners or parties at Nygard's residences, particularly in the Bahamas and in Marina del Rey, California… Many victims were initially induced, coerced, and forced to have sex with Nygard through one or more of the following: false promises of modeling or fashion industry jobs; the supply of alcohol and/or drugs, including the drugging of drinks without the victim's knowledge; and physical force." *Id.* at ¶ 13.

7.      The payment of cash to victims as a means to silence and intimidate them was recounted extensively in the DOJ Indictment, stating: "In some instances, Nygard intended these payments to secure a victim's silence. In other instances, Nygard intended these payments to facilitate future sexual activity with the victim induced through force, fraud, and coercion." *Id.*

8.      Nygard and his conspirators, including myriad Nygard Company employees, actively coordinated to shame, intimidate, and terrify victims into paralyzing fear that prevented them from being able to understand and/or assert their rights. As stated in the DOJ Indictment, Nygard and employees of the Nygard Companies "engaged in obstructive conduct aimed at preventing witnesses from reporting Nygard's sexual crimes." *Id.* at ¶ 3.

9.      Further, "Nygard maintained control over his victims through threats, promises to grant or withhold modeling opportunities and other career advancement, granting and withholding of financial support, and by other coercive means, including constant surveillance, restrictions of movement, and physical isolation." *Id.* at ¶ 12. This control, manipulation and intimidation

rendered Nygard's victims effectively incapacitated from understanding and exercising their rights.

10.     On or about October 1, 2021, the Toronto Police Department issued an arrest warrant for Nygard for sexual assault and forcible confinement against multiple women ranging from 1987 until 2006.

11.     On or about March 28, 2022, the Montreal Police Department issued an arrest warrant for Nygard for sexual assault and forcible confinement against another woman between 1997 - 1998.

12.     On or about July 10, 2023, the Winnipeg Police Department issued an arrest warrant for Nygard for sexual assault and forcible confinement against another woman in 1993.

13.     On November 12, 2023, a Toronto jury found Nygard guilty of four counts of sexual assault against four different women.  Three of those women are Plaintiffs in this lawsuit.

14.     This is a civil action for damages under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §§ 1591, *et seq*., and other state and foreign laws arising from Defendant Peter J. Nygard's ("Nygard") rape, sexual assault, sexual battery, molestation, and/or sex trafficking of Plaintiffs, Jane Does Nos. 1-13.

15.     Nygard and the Nygard Companies, using interstate and foreign commerce, conspired to and did recruit, lure, and entice young, impressionable, and often impoverished children and women, with cash payments and false promises of lucrative modeling or other career opportunities in order to rape, sexually batter, sexually assault, molest, and/or sodomize them.

16.     Nygard and the Nygard Companies used their considerable influence in the fashion industry, his wealth, his power through corruption of officials, and Nygard used his network of company employees under his direction, to groom and entice children and women.

4

17.     The Nygard Companies knew or should have known that Nygard would use means of alcohol, drugs, force, fraud, and/or other forms of coercion to rape, sexually assault, sexually batter, molest, sodomize and/or sex traffic these children and women and, in many cases, with knowledge that they were younger than eighteen years old.

18.     Nygard and the Nygard Companies knowingly benefited from, and received value for, their participation in the conspiracy and/or venture, and the Nygard Companies knew, or should have known, that Nygard would rape, sexually assault, sexually batter, molest, sodomize and/or sex traffic Jane Does Nos. 1-13.

19.     The Nygard Companies, with their global headquarters in Times Square in New York City, negligently supervised their employees and were also instrumental in knowingly aiding, abetting, facilitating, and participating in Defendants' decades-long sex trafficking scheme, while knowing, or in reckless disregard of the fact, that Nygard would use means of force, fraud, and/or coercion, or knowing that the person had not attained the age of eighteen years, to force vulnerable children and women to engage in commercial sex acts in violation of the Trafficking Victim Protection Reauthorization Act ("TVPRA").

20.     Nygard's conduct of engaging in regular sexual activity with young females, including minors, was known to the Nygard Companies and their employees who were employed by Nygard or worked at his direction for the purpose of assisting Nygard in engaging in these known sexual activities, enabling the activities through payment to victims, scheduling victims to be in Nygard's presence, arranging for transportation of the victims, or engaging in schemes to silence and intimidate them.

21.     It was widely known among individuals regularly in Nygard's presence that he obtained pleasure from corrupting and inducing vulnerable young females into engaging in uncomfortable and unwanted sexual acts for his own gratification.

22.     The Nygard Companies facilitated or enabled Nygard to engage in the wide-ranging scheme to entice, lure, recruit, and participate in forced or coerced commercial sex acts.

23.     Employees of the Nygard Companies performed actions or failed to perform actions that further placed victims, including Plaintiffs, in danger of being sexually abused by Nygard, and assisted in the concealment of his sexually abusive acts.

24.     Employees of the Nygard Companies knew or should have known that Nygard was a serial sexual abuser and sex trafficker. Those individuals played necessary roles in facilitating Nygard's sexual abuse of Plaintiffs.

25.     The Nygard Companies employed young females to recruit new potential victims in order to grow the enterprise and satisfy Nygard's insatiable sexual desire.

26.     Nygard and the Nygard Companies fulfilled Nygard's compulsive need for sex with young females by preying on their personal, psychological, financial, and related vulnerabilities.

27.     Recruiters were taught by Nygard and by employees of the Nygard Companies to inform targeted young female victims that Nygard possessed extraordinary wealth, power, resources, and influence; that he was a fashion designer who could help fulfill female victims' dreams. This often was an offer to become a model, but was modified based on the specific victims' hopes and dreams.

28.     Nygard's tactics included promising the victims money, shelter, transportation, gifts, employment, modeling opportunities, gifts for their families, and other things of value.

29.     The Nygard Companies' employees were paid by Nygard to perform functions to allow his commercial sexual activity with young females, including Plaintiffs, to continue.

30.     Nygard Companies' employees were expected and paid to maintain large amounts of cash at each of Nygard's properties—including his apartment atop his corporate headquarters in New York—in order for Nygard to have money to pay the young females, including Plaintiffs, for sexual activities.

31.     Nygard Companies' employees were tasked with obtaining, controlling, and distributing hush money to victims of Nygard.

32.     Nygard Companies' employees were expected and paid to maintain a list of names and phone numbers of young females, including Plaintiffs, who had been to Nygard's properties.

33.     The Nygard Companies' employees were expected and paid to contact young females by telephone, including Plaintiffs, and use a rouse of a party, a job opportunity, or some other enticement to bring the target female to Nygard's property.  In reality, the young female was being lured to the property to engage in sexual contact with Nygard.

34.     The Nygard Companies also knowingly conspired with Nygard to commit rape, sexual assault, molestation, sodomy, and/or sexual battery in violation of various state and foreign laws, including New York, California, Florida, Ohio, Canada, the Bahamas, and the United Kingdom. Nygard owned, directly or indirectly, all of the Nygard Companies, controlled them, commingled funds, disregarded all corporate formalities, and used them to commit his unlawful acts.

35.     When Nygard and the Nygard Companies became aware of the investigation into their conspiracy and/or sex trafficking venture, through Nygard and other upper-level employees,

they resorted to tactics of violence, intimidation, bribery, payoffs, and evidence destruction to attempt to silence the victims and to continue their conspiracy and/or venture.

36.    The Nygard Companies, through Nygard and a close ring of upper-level executives, directors, officers, and/or employees, negligently supervised company personnel and employees and knowingly and continuously conspired with Nygard to enable, act as a front, and conceal Nygard's criminal activity.

37.    Nygard and the Nygard Companies have operated a continuing conspiracy and sex trafficking venture—spanning at least five decades—between Nygard, upper-level executives, employees, officers, and/or directors, of the Nygard Companies, and other individuals, resulting in a pattern and practice of rape, sexual assault, sexual battery, molestation, sodomy, and sex trafficking in countries across the globe, including the United States, Canada, the Bahamas, the United Kingdom, and other countries.

38.    Nygard's upper-level executives, officers, and directors knew or should have known, through the exercise of reasonable diligence, the observations and knowledge of Nygard's sexual appetites and predatory behavior, and the numerous victim reports that were filed, of Nygard's continuing conspiracy and/or sex trafficking venture; and were grossly negligent and violated their fiduciary duties to the Nygard Companies and the public by enabling and/or participating in Nygard's misconduct and permitting him to use the money and resources of the Nygard Companies to further the sex trafficking conspiracy and venture.

39.    Nygard used the Nygard Companies' resources and brand to rape, sexually assault, sexually batter, molest, sodomize, sex traffic, wrongfully detain, cause bodily injury, and invade the privacy of children and women. In turn, the Nygard Companies, through their executives, officers, directors, and employees, have participated in and covered up his crimes for decades so

that they could continue to benefit financially and professionally from Nygard's name, brand, and money.

40.    Over the past decades, at least nine women in Canada and California have sued Nygard or reported him to the authorities, alleging sexual misconduct.[2] Another nine former employees said in interviews that he had raped them, touched them inappropriately, or solicited sex.[3] In many instances, the Nygard Companies arranged to payoff these victims and forced them to sign non-disclosure agreements to conceal Nygard's crimes.

41.    Scores of other victims have yet to come forward to report his crimes. Until recently, Nygard has largely been able to silence his victims, with the help of the Nygard Companies and their upper-level executives and employees, through various tactics including intimidation, threats of retribution, bribery, payoffs, and forced non-disclosure agreements.

42.    Because of Nygard's actions, including the actions of the Nygard Companies, victims have a reasonable fear for their lives, particularly given the violent nature of the crimes, the hopelessness of attempting to report such crimes, Nygard's bribery of police and public officials, and the careful coordination of the methods of violence and intimidation, including false imprisonment, drugging his victims, and threats.

43.    Nygard was the founder, chairman, figurehead, chief executive, and icon of the Nygard Companies.[4]

---

[2] Kim Barker, How a Neighbor's Feud in Paradise Launched an International Rape Case, The New York Times (Feb. 22, 2020), *available at* https://www.nytimes.com/2020/02/22/world/americas/ peter-nygard-louis-bacon.html?referringSource=articleShare.

[3] Kim Barker, Fashion Mogul Peter Nygard to Step Down Amid Federal Raids, The New York Times (Feb. 25, 2020), *available at* https://www.nytimes.com/2020/02/25/us/peter-nygard-international-fbi-raid.html.

[4] Unless otherwise specified, all of the allegations in Plaintiffs' Third Amended Complaint pertain to the time period in which the acts detailed in the Third Amended Complaint occurred.

44.     Directly or indirectly, Nygard owned and/or controlled 100% of the Nygard Companies at the time of the acts detailed in the original Complaint.

45.     Although Nygard has publicly stepped down from the Nygard Companies, he has not divested his ownership interest in the Nygard Companies, and he continues to run and direct propaganda, for himself and his co-conspirators from behind the scenes. A Canadian judge, in connection with the Nygard Companies' bankruptcy proceedings, found that "[t]here is no evidence that Mr. Nygard has indeed resigned, and 100 percent of the shares of the Nygard Group" are still owned by him.

46.     As of the initial filing of this matter, Nygard controlled each of the Nygard Companies. His Board consisted of himself and two division presidents.[5]

47.     Consistent with the facts stated above, Nygard proclaims in public filings that he and his businesses are "closely associated in the public eye."[6]

48.     The Nygard Companies' promotional materials and advertisements also made the companies synonymous with "one man," Nygard, who was featured individually on almost all promotional materials and advertisements.[7]

49.     Nygard and the Nygard Companies are "closely identified in the public mind, similar to other fashion houses."[8]

---

[5] Kai Falkenberg, Peter Nygard Answers to No One, Forbes (Nov. 18, 2010), *available at* https://www.forbes.com/forbes/2010/1206/features-peter-nygard-sexual-harassment-answers-to-no-one.html#236f0e30bc9b.

[6] Complaint at ¶ 31, *Nygard, et al. v. Dipaolo, et al.*, No. 17-cv-60027 (S.D.N.Y. Jan. 5, 2017), at ¶¶ 1, 31.

[7] *See, e.g.*, video at https://corporate.nygard.com/. After the filing of the initial case against Nygard, et al., the Nygard corporate website was taken down.

[8] *See* Complaint at ¶ 31, *Nygard, et al. v. Dipaolo, et al.*, No. 17-cv-60027 (S.D. Fla. Jan. 5, 2017).

50.     At Nygard's direction, the Nygard Companies commingled funds and did not observe corporate formalities.

51.     Further, "Nygard regularly used his corporate entities and resources to facilitate the commission of these offences, including by diverting corporate funds and using corporate employees for his own criminal purposes."

52.     Nygard Inc. and Nygard International Partnership had their global headquarters in Times Square in New York City.

53.     Nygard and his companies have repeatedly invoked the jurisdiction of the United States courts by filing lawsuits in multiple United States courts, including this District.[9]

54.     Before his arrest, Nygard had a residence in New York City, which was above his flagship store near Times Square. Nygard International leased this building.

55.     Nygard owns the companies Nygard NY Retail, LLC, Nygard Partners, LLC, and Orion Asset Management, Inc., each of which is a New York corporation.

56.     At the heart of this action is a continuing conspiracy, venture, and enterprise between Nygard, upper-level employees, officers, and directors of the Nygard Companies to use the Nygard Companies to facilitate and enable the rape, sexual assault, sexual battery, molestation, sodomy, and sex trafficking of children and women in the United States, the Bahamas, Canada, the United Kingdom, and elsewhere around the world.

57.     The Nygard Companies funded what they knew or should have known was Nygard's sex trafficking conspiracy and venture, and Nygard used the Nygard Companies' brand,

---

[9] *See, e.g.*, *Nygard, et al. v. Bacon*, No. 1:19-cv-01559-LGS-KNF (S.D.N.Y. Feb. 19, 2019); *Nygard, et al. v. Dipaolo, et al.*, No. 17-cv-60027, 2017 WL 4303825 (S.D. Fla. Jan. 5, 2017); *Nygard International Partnership v. Feralio*, No. B266683, 2017 WL 4784925 (Cal. Ct. App. Oct. 24, 2017); *Nygard v. Jasper*, No. 8:15-cv-1939-T-33EAJ, 2016 WL 9526666 (M.D. Fla. Jan. 4, 2016); *Nygard, Inc. v. Uusi-Kerttula*, 159 Cal.App.4th 1027 (Cal. Ct. App. 2008); *Nygard, Inc. v. Kustannusosakeyhtio Iltalehti*, No. B192639, 2007 WL 1775963 (Cal. Ct. App. June 21, 2007).

resources, and promotional events to facilitate the rape, sexual assault, sexual battery, molestation, and sodomy of his victims and to recruit, lure, and/or entice his victims and force, defraud, or coerce them, or that the victim has not attained the age of eighteen years, into engaging in commercial sex acts.

58.    In turn, the Nygard Companies and their employees knowingly benefitted from their participation in and cover-up of Nygard's conspiracy and/or sex trafficking venture by the continued promotion of the Nygard brand, the propagation of his playboy image, and by using Nygard's full-time sex workers to render services to the Nygard Companies.

59.    Nygard, conspiring with the employees, officers, and directors referenced above, and the Nygard Companies, used their resources and brand, engaged in a pattern and practice of rape, sexual assault, sexual battery, molestation, and sodomy, including recruiting, luring, enticing, and obtaining children and women, and causing them through force, fraud or coercion, or that the victim had not yet attained the age of eighteen years, to engage in commercial sex acts through, among other means, promising lucrative modeling opportunities and other career opportunities, providing cash payments, drugging his victims, confiscating his victims' passports, preventing victims from being able to travel home, preventing his victims from exiting the Nygard Cay property in the Bahamas and properties in the United States and Canada, threatening victims with physical violence, and using physical force against them.

60.    The Nygard Companies knew or should have known of Nygard's unlawful commercial sex acts and sexual assaults through him, as he is (and was during the relevant time periods herein) the founder, chairman, and 100% owner of the Nygard Companies. Other high-ranking executives and employees of the Nygard Companies also have direct knowledge of and

have covered-up Nygard's criminal activity including, without limitation, the executives and employees identified above.

61.     Further, the Nygard Companies, through Nygard and their officers and directors, negligently supervised their employees, knowingly conspired, aided and abetted, facilitated, and participated in Nygard's illegal sex trafficking venture and/or conspiracy by being integrally involved in the sex trafficking, sexual assault, sexual battery, molestation, sodomy, and/or rape of children and young women, examples of which are listed below:

    a.  Defendants used the Nygard Companies' money, brand, and resources to facilitate and commit rapes, sexual assaults, sexual batteries, molestations, sodomy, and commercial sex acts in the United States, Bahamas, Canada, Panama, the United Kingdom, and elsewhere around the world.

    b.  Defendants used the guise of modeling or other career opportunities with the Nygard Companies to recruit, lure and entice young girls and women to locations in New York, California, Winnipeg, Toronto, Montreal, and the Bahamas so that Nygard could rape, sexually assault, sexually batter, molest, sodomize, and/or sex traffic them.

    c.  Defendants hosted regular company events known as "pamper parties,"[10] in the Bahamas and California under the Nygard brand and with the Nygard Companies' resources, to both promote the Nygard Companies' brand and facilitate rape, sexual assault, sexual battery, molestation, sodomy, and sex trafficking. In doing so, Nygard was acting on behalf of the Nygard Companies, under the brand and reputation of the

---

[10] *See* https://www.youtube.com/watch?v=WPFz3_yfj2I. After the filing of this Complaint, Nygard and his co-conspirators tried to expunge all evidence, including videos and links noted in previous versions of this Complaint.

Nygard Companies, and using the Nygard Companies to commit and cover-up his crimes.

d. Defendants used fraud and deceit to knowingly lure and entice children and women to Nygard Cay and Nygard's Marina Del Rey properties under the false pretense of attending "pamper parties" and promising, among other things, interviews for lucrative modeling opportunities when, in fact, Nygard had no intention of fulfilling his empty promises.

e. The Nygard Companies funded Nygard's "pamper parties" in California under the Nygard brand by using cash from the bank accounts of the Nygard Companies, headquartered in New York, routing the wires through New York, and using the money and resources to fund Defendants' conspiracy and/or sex trafficking venture by purchasing supplies for "pamper parties," paying employees and staff to work the "pamper parties" and recruit new victims at the "pamper parties," and directly paying for commercial sex acts.

f. The Nygard Companies funded Nygard's "pamper parties" in the Bahamas under the Nygard brand by transferring cash from their bank account in Canada, routing it through New York, and depositing it in a Bahamian bank account that belongs to a Bahamian holding company called Nygard Holdings.

g. The Nygard Companies used corporate accounts to pay for drugs, alcohol, entertainment, services, and food for the "pamper parties," and also provided the cash that Nygard delivered to accomplices and victims to facilitate Nygard's rape, sexual assault, sexual battery, molestation, sodomy, and/or sex trafficking of children and young women.

h. The Nygard Companies also paid all employees and staff, including those who recruited children and women to engage in commercial sex acts with Nygard, who worked the "pamper parties."

i. The Nygard Companies paid, promoted, and/or advanced the careers of executives and employees so that they would "recruit" victims, turn a blind eye to Nygard's criminal activity, and/or cover-up his criminal activity.

j. Nygard used the Nygard Companies' boats, including but not limited to, the "Yves Lauren," "Heesen MIRAGE," and "Lady Hilkka," at least one of which is docked in Florida, for months at a time, to transport drugs, liquor, and supplies for the "pamper parties."

k. Nygard used the Nygard Companies' employees, resources, and the Nygard Companies' customized "N-Force" jet to transport his victims to destinations in the United States, Canada, the Bahamas, and around the world including, without limitation, his residences and locations in the Bahamas, California, Florida, New York, Toronto, and Winnipeg.

l. Nygard also used the Nygard Companies' resources including, without limitation, the corporate jet, to smuggle women, drugs, liquor, and other supplies into and out of various jurisdictions including, without limitation, the United States, Canada, and the Bahamas.

m. The adult victims that Nygard found most attractive and sexually desirable were forced and/or coerced through a combination of fraud, deception, manipulation, and physical force to become full-time sex workers which he referred to as his "girlfriends."

n.  The victims that were under the age of eighteen that Nygard found most attractive and sexually desirable were also recruited to become Nygard's "girlfriends."

o.  Nygard's "girlfriends" were coerced and enticed to move into his Nygard Cay, Marina Del Rey, and/or other properties with promises of money and/or future modeling or career opportunities, where they were not allowed to leave without his express permission. They were forced to meet his every demand including, without limitation, "recruiting" new victims to attend his "pamper parties" and other events so that Defendants could continue their conspiracy and Nygard could continue his pattern and practice of raping, sexually assaulting, sexually bettering, molesting, sodomizing, and/or sex trafficking children and women.

p.  Nygard's "girlfriends" were also forced to accompany him on Nygard Companies-sponsored fashion tours in the United States, Canada, and elsewhere around the world, where they were required to commit commercial sex acts that satisfied his perverse sexual desires, "recruit" new victims for him while on tour and provide services to the Nygard Companies.

q.  Nygard's "girlfriends" were always paid varying amounts of cash in United States currency, submitted to and provided by the Nygard Companies' financial personnel, and paid directly by Nygard to help ensure their compliance and silence. Nygard's longtime "girlfriends" were also put on the Nygard Companies' official payroll. They were paid monthly through direct deposit with funds from a Nygard corporate account by the Nygard corporate accountant, often Lili Micic. They were required to submit invoices that stated that they were being paid for "modeling and promotional services"—even though they were full-time sex workers. Every payment had to be

directly approved by Nygard himself. The amounts of their payments were based upon their level of servitude to Nygard, their ability to satisfy his sexual desires, and their ability to "recruit" new victims for him to rape, sexually assault, sexually batter, molest, sodomize, and/or engage in commercial sex acts with.

r. Travel arrangements for Nygard's "girlfriends" and victims were made and paid for through Nygard's corporate travel department, which is headquartered in the United States.

s. Nygard frequently took his "girlfriends" and victims to his New York City residence. He regularly forced or coerced his "girlfriends" to accompany him to "swingers" clubs in New York City. While at the "swingers" clubs, Nygard forced his "girlfriends" to find couples for him to have sex with. He then paid, forced, and/or coerced his "girlfriends" to have sex with other men, while he watched and engaged in sex with the men's partners. Nygard treated sex like a currency.

t. Nygard used employees paid by the Nygard Companies, using Company-owned computers, email, phones, and social-media accounts to lure his victims to locations in the United States, the Bahamas, Canada, and elsewhere around the world, so that Nygard using force, fraud and coercion, or the victim had not attained the age of eighteen years, caused them to engage in commercial sex acts.

u. Nygard kept a database, in at least California and the Bahamas, of potential victims that was maintained by the Nygard Companies' corporate IT department on the corporate server (mostly maintained in the United States). By the mid-2000s, this database contained information on over 7,500 underage girls and women.

v.   The Nygard Companies and Nygard employed people to work at what Nygard referred
to as Nygard's Corporate Communications Coordinators ("ComCor"). Among other
duties, ComCor employees were used to ensure that Nygard's potential victims
attended the "pamper parties" by contacting them and arranging for their transportation
to the parties. Thereafter, Nygard seduced, coerced, enticed, paid, and/or promised
these victims modeling and other career opportunities in order to rape, sexually assault,
sexually batter, molest, sodomize, or cause them to engage in commercial sex acts. All
ComCor employees were paid by the Nygard Companies.

w.   Upon arrival at the gated Nygard Cay and Marina Del Rey properties, Nygard required
his employees to "register" his victims with ComCor, which was in charge of planning
and coordinating corporate events, by providing their personal information, such as
their names, telephone numbers, email addresses, and the identities of the persons who
invited them. They were also required to pose for headshots and full-body photographs.
A selection of the pictures and registration forms, filled out by the Nygard Companies'
employees, were scanned and emailed directly to Nygard, so that he could review who
was in attendance and rate or grade his potential victims, while sitting upstairs in his
bedroom. Nygard would then use this information to select his potential victims, and
based upon the ratings he gave pursuant to his self-avowed standard of: "an eight in the
face, and a nice toilet."

x.   The information was then entered into a Company database by ComCor employees, at
Nygard's direction, so that Nygard had a ready list of "prospective recruits" who were
potential victims to pursue at any given time. The database contains ratings or grades,
information, and pictures of over 7,500 underage girls and women dating back to 1987.

The database was hosted on a corporate server and was maintained by the Nygard Companies' IT department. Nygard's head of IT, Daane Clifford,[11] was responsible for reviewing every single email sent to Nygard and had perhaps the most knowledge of any person other than Peter Nygard. At the young age of 44, with no known serious health issues, Mr. Clifford died suddenly just a few months after *The New York Times* was known to be investigating this story and had contacted Mr. Clifford. The family characterized his death as a "sudden passing."

y.  Nygard's ComCor was used to keep track of, make contact with, and lure potential victims to New York, Nygard Cay, Marina Del Rey, and other properties in Canada and the United States through the database. Nygard instructed the Company-paid employees to call and text potential victims to invite them to "pamper parties," transport girls to and from the "pamper parties," or to otherwise pay for their transportation.

z.  Nygard's ComCor also used social media to post about "pamper parties" and to direct-message potential victims who met Nygard's specifications to invite to "pamper parties." Nygard's ComCor knowingly recruited these victims for Nygard and were paid by the Nygard Companies, headquartered in New York, with cash routed through New York and paid out of the Nygard Companies' corporate accounts.

aa. Using the Nygard Companies' resources, including United States currency, Nygard, on his own and through his direction to his employees, paid many of his victims for commercial sex acts.

---

[11] *See* https://www.linkedin.com/in/daane-clifford-9a180332/?originalSubdomain=ca; *see also* Obituary, Daane Mark Anthony Clifford (May 26, 2019), *available at* https://www.dignitymemorial.com/obituaries/langley-bc/daane-clifford-8735816.

bb. Nygard used his financial resources, influence, power in the Bahamas, Canada, and United States, and psychological manipulation to intimidate his victims and to prevent his crimes from being reported. Those of his "girlfriends" who tried to leave him were harassed and threatened by Bahamian police who were on Nygard's payroll (and who were paid with Nygard Companies' United States currency).

cc. Nygard and the Nygard Companies made a concentrated and deliberate effort to protect and conceal Nygard's criminal activities. For example, Nygard initiated a scheme to purchase police protection and political cover in the Bahamas, using funds of the Nygard Companies, by making regular payments of tens of thousands of dollars to law enforcement, government officials, regulators, and even to a former Cabinet Minister who became the Prime Minister of the Bahamas. This scheme was so powerful and successful that victims who escaped Nygard Cay were often brought back to the Cay by the Bahamian police.

dd. After a kidnapping and multi-day rape of a Canadian victim, Nygard's nephew picked up the victim from a warehouse and instructed the victim not to call the Winnipeg police because Nygard "owns them."

ee. Nygard and the Nygard Companies, with knowledge of his criminal activity, also force employees to sign mandatory non-disclosure agreements to attempt to prevent them from reporting his illegal activity. Nygard and the Nygard Companies also threatened to sue or sued anyone who went public with accusations against him.[12]

---

[12] *See, e.g.*, *Nygard, Inc. v. Uusi-Kerttula*, 159 Cal. App. 4th 1027 (2008); *Nygard, Inc. v. Kustannusosakeyhtio Iltalehti*, No. B192639, 2007 WL 1775963 (Cal. Ct. App. June 21, 2007); Fashion tycoon Peter Nygard files criminal complaint against CBC, The Globe and Mail (April 1, 2011), available at https://www.theglobeandmail.com/news/national/fashion-tycoon-peter-nygard-files-criminal-complaint-against-cbc/article574862/.

ff. Nygard and the Nygard Companies, with knowledge of his criminal activity, also paid-off numerous victims and forced or coerced them to sign unenforceable non-disclosure agreements to conceal Nygard's crimes.

gg. A "girlfriend" was forced, coerced, and instructed by an executive of the Nygard Companies, to create false video testimony to support a defamation criminal case Nygard filed against CBC News and the journalist personally, for daring to publish a story that was not flattering to Nygard and the Nygard Companies.

hh. Nygard used funds from the Nygard Companies to make political contributions and bribe and/or payoff government officials and law enforcement personnel to further Defendants' conspiracy and/or sex trafficking venture.

ii. In an effort to reinforce fear, control, and dominance over his victims, Nygard regularly flaunted his political power and control of the Bahamian police and the Bahamian government by inviting and parading government officials at his Nygard Cay property and in front of Nygard's victims.

jj. Nygard gifted his "girlfriends" to Bahamian government officials and instructed the "girlfriend" which sex acts they were required to perform with the government official as repayment for political favors.

kk. Nygard also paid people, using Nygard Company money, to intimidate his former "girlfriends" by slashing their tires, committing arson, paying police to threaten to arrest them, and having them followed.

ll. Around the time of the filing of the original Complaint, and continuing to this day, Defendants have taken overt and active measures to conceal the wrongdoing and destroy evidence.

62.    Nygard intentionally used the Nygard Companies' resources and brand to rape, sexually assault, sexually batter, molest, sodomize, and/or recruit, lure, and entice children and women to cause them to engage in commercial sex acts and other degrading acts, for which he always offered and/or provided Nygard Companies' resources and/or purported career opportunities as value.

63.    Further, the Nygard Companies knowingly financed Nygard's commercial sex acts as well as facilitated and enabled the rape, sexual battery, sexual assault, molestation, sodomy, and/or sex trafficking of his victims.

64.    The Nygard Companies marketed Nygard's playboy image, the Nygard Cay[13] and Marina Del Rey[14] properties, and "pamper parties" as part of the Nygard brand, which benefited the Nygard Companies[15] and provided Nygard with access to a steady supply of victims. Nygard's public image was used to promote the Nygard brand and its products in the Bahamas and around the world, as well as to facilitate Defendants' conspiracy and/or sex trafficking venture.

65.    The Nygard Companies promoted and/or furthered the careers of employees who facilitated, aided and abetted, and covered-up Nygard's sex crimes so they could benefit from Nygard's name, brand, and work.

---

[13] *See, e.g.* Billionaire Fashion Designer Peter Nygard welcomes models to world's Richest Resort, Pimping Pictures, (Jun. 11, 2008) *available at* http://pimpingpictures.com/Jarmopohjaniemi.com/Blog/Entries/2008/6/11_Nygard_Cay_Hosts_Playboy_Shoot.html; NYGARD Cay and Wyndham Nassau Resort Host Racey Girl Model Search in the Bahamas, Traveling Star Productions (2009), *available at* http://travelingstarproductions.com/OO/RaceyGirl.htm; Nygard Cay, Nygard Corporate (2013), *available at* https://web.archive.org/web/20130730175349/http://corporate.nygard.com/SCF/NygardCayBahamas.aspx?ID=38&Folder_id=55.

[14] *See, e.g.* https://www.instagram.com/p/BehBmpwDZW-/?hl=en

[15] Pamper party at Nygard Inc., YouTube (Jan. 26, 2018), *available at* https://www.youtube.com/watch?v=9sb2TEoqZtw; https://www.youtube.com/watch?v=WPFz3_yfj2I; Nygard Inc. Dinner Party, YouTube (Feb. 23, 2018), *available at* https://www.youtube.com/watch?v=nIJWrU9wq7w.

66.    The Nygard Companies knowingly benefited financially from Nygard's conspiracy and/or sex-trafficking venture internationally. By facilitating and covering-up Nygard's rapes, sexual assaults, sexual batteries, molestations, sodomy, and commercial sex acts, the Nygard Companies enjoyed the promotion and promulgation of the Nygard Companies' projects internationally. The Nygard Companies' actions affected foreign commerce in many ways, including, that the travel department of the Nygard Companies arranged and paid for the victim's transportation to and from the Bahamas or other destinations, U.S. currency was used to bribe public officials and law enforcement in foreign countries to conceal Nygard's criminal activity, the Nygard brand and Company were promoted and advertised internationally, and the Nygard Company and its employees negotiated commercial sex acts with high powered individuals who, in return, gave favorable dealings to the Nygard Companies, which financially benefited the Nygard Companies.

67.    The Nygard Companies also benefited from the services that Nygard's sex workers were forced to provide to the Nygard Companies including, without limitation, modeling company clothing for company executives, their clothing design ideas, preparing Nygard for his business meetings, attending business meetings, and perpetuating Nygard's playboy image, which is a crucial component of the Nygard brand. Indeed, the Nygard Companies' corporate website touts Nygard's "reputation of a playboy entrepreneur" who "knows what women want," a marketing plan that is "by design" and makes women "love to wear his fashions."[16]

68.    Defendants' conduct, as outlined above, violates the TVPRA, which outlaws using means of interstate or foreign commerce to recruit, entice, obtain, or lure a person and force or coerce that person, or that the person had not attained the age of eighteen years, to engage in

---

[16] http://www4.nygard.com/scf/News.aspx?id=7774

commercial sex acts. Nygard's conduct also violates various other state and foreign laws, including the laws of California and New York.

69.    The Nygard Companies also violated the TVPRA and related state and foreign laws because they knowingly benefitted from their conspiracy and/or participation in a venture in which they knew or should have known that means of force, threats of force, fraud, or coercion were used to cause the a person to engage in commercial sex acts, or the person had not yet reached 18 years of age and engaged in commercial sex acts.

## PARTIES

**A.    Plaintiffs**

70.    Jane Doe No. 1 is a resident of California and is s*ui juris*.

71.    Jane Doe No. 2 is a resident of California and is s*ui juris*.

72.    Jane Doe No. 3 is a resident of California and is s*ui juris*.

73.    Jane Doe No. 4 is a resident of New York and is s*ui juris*.

74.    Jane Doe No. 5 is a resident of New Jersey and is s*ui juris*.

75.    Jane Doe No. 6 is a resident of New York and is s*ui juris*.

76.    Jane Doe No. 7 is a resident of New York and is s*ui juris*.

77.    Jane Doe No. 8 is a resident of Florida and is s*ui juris*.

78.    Jane Doe No. 9 is a resident of Texas and is s*ui juris*.

79.    Jane Doe No. 10 is a resident of Florida and is s*ui juris*.

80.    Jane Doe No. 11 is a resident of California and is *sui juris.*

81.    Jane Doe No. 12 is a resident of New York and is *sui juris.*

82.    Jane Doe No. 13 is a resident of Colorado and is *sui juris.*

83.    Plaintiffs are using pseudonyms to protect their identities because of the sensitive and highly personal nature of this matter.

84.    Due to the violent nature of rape and the brutal methods of abuse employed by Nygard and his associates against Plaintiffs, along with the coordinated methods of coercion and intimidation, Plaintiffs feared—and fear—for their lives. Plaintiffs have suffered significant mental and emotional harm from the events and their aftermath, such that many could not bring themselves to be retraumatized or further endanger themselves by publicly identifying themselves.

85.    Defendants routinely collected and retained photographs and personal data, including all information present on formal identification, like home address, for prospective models and guests of Nygard at his various properties—Plaintiffs knew they could be found and harmed by Nygard's agents.

86.    Moreover, Defendants' intimidation in the form of coordinated displays of power and international influence, both monetary and political, have continuously led Nygard's many victims to believe that they would have no safe or effective avenue for relief for any claim. Such intimidation includes not only direct threats but also includes Defendants' publicly known, decades-long, industry-wide (and, in fact, social-scene-wide) reputation for silencing those who would speak out against them. Plaintiffs feared—and continue to fear—for their safety.

87.    Plaintiffs are particularly vulnerable because of the trauma that they have been subjected to, their socioeconomic status, Defendants' wealth and influence in the Bahamas, Canada, and the United States, and the corruption of local law enforcement by Defendants through bribery and political influence.[17]

---

[17] *See, e.g.*, https://www.youtube.com/watch?v=Pw1xUXQNelg; Nico Scavella, Nygard 'Outright Bribery' of Plp, The Tribune (Feb. 13, 2018), *available at* http://www.tribune242.com/news/2018/feb/14/nygard-outright-bribery-plp/; Rashad Rolle, Nygard Gave Money to Plp – Then Asked for Help Over Land Issues, The Tribune (June 24, 2014), *available at* http://www.tribune242.com/news/2014/jun/25/nygard-gave-money-plp-then-asked-help-over-land-is/; Fresh Questions Over Las Vegas Trip to PM, Gibson and Nygard Meeting, The Tribune (May 5, 2017), *available at* http://www.tribune242.com/news/2017/may/05/fresh-questions-over-las-vegas-trip-pm-gibson-and-/.

88.    Plaintiffs' safety, right to privacy, and security outweigh the public interest in their identification.

89.    It is in the public's interest to give anonymity to sexual abuse and sex trafficking survivors so that other victims will feel the ability to come forward and not be fearful that their identity will be publicized.

90.    Plaintiffs' legitimate concerns outweigh any prejudice to Defendants by allowing Plaintiffs to proceed anonymously.

**B.    Defendants**

91.    Defendant Peter J. Nygard is a Finnish and Canadian citizen, and upon information and belief, a U.S. permanent resident, with permanent residences in the United States, including in New York City, NY and Marina Del Rey, CA. At all relevant times to this Complaint, he was the founder, chairman, figurehead, icon, and, directly or indirectly, the 100% owner of the Nygard Companies.

92.    Through the Nygard Companies, as Nygard himself alleged in United States federal court, he "carries on business at various locations around the world as a designer, manufacturer, distributor, and seller of women's clothing and accessories. Mr. Nygard and his business are closely associated in the public eye."[18] Nygard regularly traveled to the United States, spent substantial time at his personal residence in this District, and conducted substantial business in this District through his global headquarters and flagship store, which (until the FBI raided the property on February 25, 2020) were located in this District.[19]

---

[18] *See* Complaint at ¶¶ 1, 31, *Nygard, et al. v. Dipaolo, et al.*, No. 17-cv-60027 (S.D. Fla. Jan. 5, 2017).

[19] *See* https://vimeo.com/160922029

93.     At all times material to this Complaint, Defendant **Nygard Inc.** was a Delaware corporation that distributed women's apparel with its global headquarters in New York City. Nygard Inc. conducted substantial business in this District and at various other locations in the United States and around the world.

94.     At all times material to this Complaint, Defendant **Nygard International Partnership** was a Canadian corporation that had its administrative offices in Winnipeg, Canada and its global headquarters in New York City.[20] Nygard International conducted substantial business in this District and various other locations in the United States and around the world.[21]

95.     At all times material to this Complaint, Defendant **Nygard International, Inc**., was a Delaware corporation with its World Headquarters at 1435 Broadway, New York, New York.

96.     At all times material to this Complaint, Defendant **Nygard Holdings Limited** was a Bahamian shell corporation registered in the Bahamas. Nygard used Nygard Holdings Limited as a depository for funds from Nygard International, from which Nygard paid for Defendants' conspiracy and/or sex trafficking venture.

97.     At all times material to this Complaint, Defendant **Nygard Holdings (USA) Limited** was a Delaware corporation with a registered address of 1209 Orange Street, Wilmington, DE 19801.

---

[20]https://web.archive.org/web/20180318105633/https://corporate.nygard.com/about-nygard/ ("Along with its corporate headquarters located in the heart of Times Square, the company lays claim to complete design, production and distribution facilities in Los Angeles, Toronto and Winnipeg, superb research and design studios in New York and Shanghai, and sales offices throughout Canada and the U.S."); https://www.linkedin.com/company/nygard-international/about/ ("Along with its new World Headquarters located in the heart of Times Square, the company lays claim to complete design, production & distribution facilities in Los Angeles, Toronto & Winnipeg and superb research & design studios worldwide."); https://web.archive.org/web/20200119193257/http://www3.nygard.com/Store/webcast/NY_event_Macy's_parade/page1.asp.

[21] https://web.archive.org/web/20180318105633/https://corporate.nygard.com/about-nygard/

98.    At all times material to this Complaint, Defendant **Tan Jay International LTD.** ("Tan Jay") was a Canadian corporation registered for business in California, with a registered address at 110 East Ninth St., B1321, Los Angeles, California. Tan Jay was a predecessor entity to Nygard International.

99.    At all times material to this Complaint, Defendant **Nygard NY Retail, LLC** was a New York domestic limited liability company, with a registered address at 1435 Broadway, New York, New York.

100.    At all times material to this Complaint, Defendant **Nygard Partners, LLC** was a New York domestic limited liability company with a registered address at 202 Prospect Ave., Staten Island, NY.

101.    At all times material to this Complaint, Defendant **Nygard Properties Ltd.** was a holding company with its business address at 1485 Portage Ave., Winnipeg, MB Canada.

102.    At all times material to this Complaint, Defendant **Nygard Enterprises Ltd.** was a holding company with its business address at 1771 Inkster Blvd, Winnipeg, MB. The parent company of Nygard Enterprises Ltd. Is Nygard International, Inc., located in New York.

103.    At all times material to this Complaint, Defendant **Nygard Enterprises LLC** was a Delaware domestic limited liability company with a registered business address at 14 Bridgewater Drive, Winter Haven, FL.

104.    At all times material to this Complaint, Defendant **Nygard Capital Inc.** was a company located at 14430 26th Ave., Flushing, New York.

105.    At all times material to this Complaint, Defendant **Orion Asset Management, Inc.** was a New York corporation with its registered business address at 575 Madison Avenue, New York, NY 10022.

106. At all times material to this Complaint, Defendant **Nygard Company LLC** was a California domestic limited liability company, with a registered business address of 6240 Binet Dr., Citrus Heights, California.

107. At all times material to this Complaint, Defendant **Nygard Biotec Corp.** was a Delaware domestic corporation located in the Bahamas.

108. At all times material to this Complaint, Defendant **Nygard Ventures, Inc.** was a Delaware domestic corporation, with a registered business address of 14401 S. San Pedro St., Gardena, California.

109. At all times material to this Complaint, Defendant **Fashion Ventures Inc.** was a California domestic corporation, with the principal business address listed at 3951 Higuera St., Suite 100, Culver City, California.

110. At all times material to this Complaint, Defendant **4093887 Canada Inc.** was a Canadian corporation with a registered business address of 1771 Inkster Blvd., Winnipeg, MB, Canada.

111. At all times material to this Complaint, Defendant **4093879 Canada Inc.** was a Canadian corporation with its principal executive office at 1771 Inkster Blvd., Winnipeg, MB, Canada.

112. At all times material to this Complaint, Defendant **13700 Saticoy LLC** was a fictious business name of a California domestic limited liability company, with a current registered business address of 3951 Higuera Street, Suite 100, Culver City, California. 13700 Saticoy LLC is the primary owner of 13704 Saticoy Street in Panorama City, California.

113.    At all times material to this Complaint, Defendant **Brause Investments Ltd.** ("Brause") was a Delaware domestic corporation with its principal place of business at 12120 SW 131 Ave., Miami, FL. Brause is listed as the primary owner of 1 Yawl Street in Marina del Rey.

114.    At all times material to this Complaint, Defendant **Edson's Investments Ltd.** was a Delaware domestic corporation with its principal place of business at 12120 SW 131 Ave., Miami, FL.

115.    At all times material to this Complaint, Defendant **9450 Topanga Properties, LLC** is a Delaware LLC with its principal place of business in Culver City, and its mailing address in Winnipeg. 9450 Topanga Properties, LLC is the primary owner of 9450 Topanga Canyon Blvd. in Chatsworth, California.

116.    At all times material to this Complaint, Defendant **14702 South Maple Street, LLC** is a California LLC with its primary place of business in Marina del Rey, California. Gregory Alan Fenske is listed as the CEO.

117.    At all times material to this Complaint, Defendant **NBH, LLC** is a Delaware LLC with its principal place of business at the same address in Culver City, CA as 9450 Topanga Properties, LLC and the same mailing address as 9450 Topanga Properties, LLC in Winnipeg. NBH, LLC is an officer/director, along with Gregory Alan Fenske, of 9450 Topanga Properties, LLC.

118.    At all times material to this Complaint, Defendant **Dragyn Industries LLC** was a California domestic limited liability corporation with its registered business address at 3951 Higuera St., Suite 100, Culver City, California.

119.    The above corporate entities are the "Nygard Companies." There is no corporate distinction between or among the Nygard Companies and Nygard. At all times relevant herein,

Nygard was the sole owner and executive of the Nygard Companies, their funds were commingled, and the companies did not observe any corporate formalities. Although Nygard publicly claimed to have stepped down from the Nygard Companies, he has not divested his ownership interest in the Nygard Companies, and he continues to run and direct the Nygard Companies from behind the scenes. A Canadian judge found that there is no evidence that Nygard has resigned from the Nygard Companies and he still owns 100% of the Nygard Companies' stock. Every aspect of the Nygard Companies' business is controlled exclusively by Nygard, and nothing can happen without his express direction or authorization.

120.    **Gregory Alan Fenske** is, on information and belief, a Canadian citizen and is *sui juris*. Fenske is an officer/director of multiple Nygard Companies and was instrumental in Nygard's attempts to evade accountability and to divert funds.

121.    **Tiina Tulikorpi** is, on information and belief, a Canadian citizen and is *sui juris*. Tulikorpi was a key officer/director of multiple Nygard companies, including but not limited to Edson's, Brause, and 14702 South Maple Street, LLC, and was instrumental in Nygard's attempts to evade accountability and to divert funds.

122.    **David Paton** is, on information and belief, a Canadian citizen and is *sui juris*. Paton was a key officer/director of multiple Nygard companies, including but not limited to Brause, and was instrumental in Nygard's attempts to evade accountability and to divert funds. Paton was the head of human resources at various Nygard Companies and had first-hand knowledge of Nygard's sex trafficking.

123.    **Scarlett Nygard Szczepaniak**, is on information and belief, a Canadian citizen and is *sui juris*. She was a key officer/director of multiple Nygard companies, including but not limited to Edson's, and was instrumental in Nygard's attempts to evade accountability and to divert funds.

124.    **James Bennett** is, on information and belief, a Canadian citizen and is *sui juris*. Bennett was a key officer/director of multiple Nygard companies, including but not limited to Edson's, and was instrumental in Nygard's attempts to evade accountability and to divert funds.

125.    At all times material to this Complaint, Defendant **Starwood Hotel and Suites Worldwide, Inc.**, who was headquartered in Connecticut, was doing business as The W New York – Times Square, located at 1567 Broadway, New York, NY 10036 ("The W Hotel").

## JURISDICTION AND VENUE

126.    This Court has federal question subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, because Plaintiffs bring this action under the federal TVPRA statute, 18 U.S.C. §§ 1591, *et seq*.

127.    This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a), because all claims alleged herein are part of a continuing conspiracy and uniform pattern and practice and form part of the same case or controversy.

128.    Plaintiffs Jane Does Nos. 1-13's claims arise out of the same series of transactions or occurrences and share common questions of law or fact. The essential facts of Jane Doe Nos. 1-13's claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in a single lawsuit. There is also substantial overlap in questions of law or fact across Jane Does Nos. 1-13's claims.

129.    Some of Plaintiffs' claims arise under 18 U.S.C. § 2255, constituting nationwide jurisdiction, as Defendants have purposefully availed themselves of the United States.

130.    Defendants Nygard Inc., Nygard International Partnership, Nygard International, Inc., Nygard NY Retail, LLC, Nygard Partners, LLC, Nygard Capital Inc., and Orion Asset Management, Inc. are all headquartered or operating in this District.

131.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2), insofar as a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this judicial district, and 28 U.S.C. § 1391(b)(3), insofar as Defendant is subject to this Court's personal jurisdiction.

132.    Venue is also proper in this District under 28 U.S.C. § 1391(b)(3), because all Defendants conduct substantial activities in this District and are subject to personal jurisdiction in this District and there is no other district where the action may be brought.

## FACTUAL ALLEGATIONS

**A.    Peter J. Nygard is Synonymous with the Nygard Companies and the Nygard Companies Have Knowledge of His Sex Crimes.**

133.    Defendant Peter J. Nygard is a renowned fashion figure and executive in the women's apparel industry. He has an estimated net worth of approximately $900 million through various business entities that he owns in the fashion industry.[22]

134.    Prior to his recent arrest, Nygard had a permanent residence in New York - a penthouse apartment on the sixth floor of the Nygard Companies' World Headquarters in New York City. Nygard illegally converted the sixth floor into a private apartment with a jacuzzi,

---

[22]  *See*  https://www.youtube.com/watch?v=yH0ODUKH1qE;  https://www.youtube.com/watch?v=L1x-Vrn-33M; https://www.youtube.com/watch?v=iK5hlWl5qLc.

according to a citation Defendants received from the City of New York in 2013. Below is a photograph of the "disco room" in Nygard's penthouse apartment in New York City:



135.    Defendant Nygard Inc. is a Delaware corporation that distributes women's apparel with its global headquarters in New York, New York.

136.    Defendant Nygard International Partnership is a Canadian corporation that is one of the largest women's clothing manufacturers and suppliers in the world, with annual sales exceeding $500 million. Nygard International had administrative offices in Winnipeg, Canada, and its global headquarters in New York City, pictured below.[23]



137.    Nygard uses Nygard Holdings as a depository for funds from Nygard International, from which Nygard pays for Defendants' conspiracy and/or illegal sex trafficking venture.

138.    Nygard, Nygard, Inc., Nygard International, and other Nygard Companies have invoked the jurisdiction of the United States courts by filing lawsuits in the United States courts, including this District, as well as being "synonymous" with Nygard Inc. and using Nygard Inc. to

---

[23] https://web.archive.org/web/20180318105633/https://corporate.nygard.com/about-nygard/.

participate in his conspiracy and/or criminal venture for both his own benefit and the benefit of the Nygard Companies.[24]

139.    Nygard is the founder, chairman, figurehead, icon, and, directly or indirectly, owned or controlled the Nygard Companies at the time of the events described in this Complaint.[25]

140.    Although Nygard publicly claimed to step down from the Nygard Companies, he has not divested his ownership interest in the Nygard Companies, and he continues to run and direct the Nygard Companies from behind the scenes. Nygard publicly claimed to step down solely as means to avoid bad publicity for the Nygard Companies.

141.    He still controls every aspect of the Nygard Companies' business, and nothing can be done without his express authorization or direction. Nygard commingles the Nygard Companies' funds, uses the Nygard Companies as his own personal bank account, and does not observe any corporate formalities.

142.    Nygard admits in public filings that he and his businesses are "closely associated in the public eye."[26]

---

[24] *Nygard, et al. v. Bacon, Supra* note 8.

[25] *See* Complaint at ¶ 1, *Nygard, et al. v. Dipaolo, et al.*, No. 17-cv-60027 (S.D. Fla. Jan. 5, 2017).

[26] *Id.* at ¶¶ 1, 31.

143.    The Nygard Companies' promotional materials and advertisements also make the companies synonymous with "one man," Nygard, who is featured individually, in spectacularly air-brushed fashion, on almost all promotional materials and advertisements.[27]



144.    In addition, Nygard and his businesses are "closely identified in the public mind, similar to other fashion houses," as illustrated by the corporate billboard in the heart of Times Square.[28]



145.    The Nygard Companies have also trademarked the name "Peter J. Nygard."

---

[27] *See, e.g.*, video at https://web.archive.org/web/20180224034345/https://corporate.nygard.com.

[28] *See* Complaint at ¶ 31, *Nygard, et al. v. Dipaolo, et al.*, No. 17-cv-60027 (S.D. Fla. Jan. 5, 2017).

146.     The Nygard Companies' promotional materials prominently feature his Nygard

Cay and Marina Del Rey properties (he even named Nygard Cay after himself and the company).[29]

The Nygard brand and logo is also featured prominently at Nygard Cay and Marina Del Rey, and

all events hosted at the properties are the Nygard Companies' corporate functions.[30] Nygard has

also stated in public filings that Nygard International has a corporate office at Nygard Cay.

147.     Nygard and the Nygard Companies use the Nygard Cay property to promote the

Nygard Companies' brand by renting it out and having events and parties with celebrities and

politicians including, among others, Oprah Winfrey, Michael Jackson, George H.W. Bush, Robert

De Niro, Prince Andrew, and Sean Connery.[31]



---

[29] *See* https://www.youtube.com/watch?v=GQRDS-KlOw0; *https*://vimeo.com/160922029

[30] *See* Billionaire Fashion Designer Peter Nygard welcomes models to world's Richest Resort, Pimping Pictures, (Jun. 11, 2008) *available at* http://pimpingpictures.com/Jarmopohjaniemi.com/Blog/Entries/2008/6/11_Nygard_Cay_Hosts_Playboy_Shoot.html.

[31] *See* Anique Gonzalez, Indulge in the Pleasures of Nygard Cay, Law Crossing (Oct. 22, 2007), *available at* https://www.lawcrossing.com/article/3372/Indulge-in-the-Pleasures-of-Nygard-Cay/; *see also* https://corporate.nygard.com/2006/12/09/nygards-cay-an-island-of-fantasy-the-ultimate-treehouse/; Oprah at Peter Nygard's estate, You Tube, *available at* https://www.youtube.com/watch?v=ZvdsxDXUeO8.

148.    Nygard uses the Nygard Cay and Marina Del Rey properties, his customized "N-Force" jet, his boats, and his apartment located above his New York City flagship store—each of which is owned or leased by the Nygard Companies or companies affiliated with the Nygard Companies—to promote himself and the Nygard Companies and, at the same time, facilitate the commission of his crimes, as noted throughout this Complaint.



149.    Nygard hosts "pamper parties"[32] at his Nygard Cay and Marina Del Rey properties, under the Nygard brand, as a means to further Defendants' illegal conspiracy and/or venture and also benefit the brand of the Nygard Companies.[33] The "pamper parties" and all supplies—including alcohol and drugs provided to adults and minors alike—are paid for by the Nygard Companies.

150.    Employees that staff the "pamper parties" are also paid by the Nygard Companies with funds that originated in and are routed through New York City.

151.    In addition to staffing the parties with bartenders, cooks, servers, maids, and other employees, the Nygard Companies also employ people to work at what Nygard refers to as

---

[32] *See* https://www.youtube.com/watch?v=WPFz3_yfj2I

[33] *See* Billionaire Fashion Designer Peter Nygard welcomes models to world's Richest Resort, Pimping Pictures, (Jun. 11, 2008) *available at* http://pimpingpictures.com/Jarmopohjaniemi.com/Blog/Entries/2008/6/11_Nygard_Cay_Hosts_Playboy_Shoot.html.

ComCor, who are used in California and the Bahamas to ensure that potential victims attend the "pamper parties" by contacting them and arranging for transportation. The Nygard Companies' ComCor employees routinely collected and retained formal identification and other identifying information from women and girls upon arranging their travel and upon arrival at Nygard residences and Nygard Companies' properties.

152.    The Nygard Companies' ComCor employees also recruit and/or procure potential victims for Nygard.

153.    ComCor employees are paid by the Nygard Companies.

154.    When girls were flown to the Bahamas on the Nygard Companies' "N-Force" jet for "pamper parties," the passengers' passports were often collected and held by Nygard employees, their return flights were either not booked or were cancelled by the corporate travel agency personnel without knowledge or permission from the traveling girls and women, and approval from Nygard was required to leave Nygard Cay and the island. Nygard expected a sex act before he was willing to consider releasing any person.

155.    Similarly, once Nygard's victims arrive at Nygard's Marina Del Rey property for "pamper parties," they are not permitted to leave without Nygard's express permission. The property is gated, and all doors are equipped with keypads that require a key code, known only by Nygard or select Nygard employees, to open. Nygard demanded his victims engage in sex acts before allowing them to leave.

156.    Once Nygard selected his victims, his employees were sometimes instructed to drug the victims, by placing Rohypnol and/or other mind-altering drugs in their drinks (sometimes referred to as "happy juice"), and to escort the victims to Nygard's bedroom or a location where they could be sexually assaulted.

157.    Nygard uses the "pamper parties" to both promote the Nygard Companies' brand and to facilitate rape, sexual assault, sexual battery, molestation, sodomy, and/or sex trafficking. He is acting on behalf of the Nygard Companies, under the brand and reputation of the companies, and using funds of the companies to commit his crimes.

158.    That Nygard is a sexual predator is an open secret at the Nygard Companies. Over the course of decades, executives, officers, and directors of the Nygard Companies as well as the corporate HR Department were instructed by Nygard to pay off anyone who accused Nygard of sexual misconduct and force them to sign nondisclosure agreements. These upper-level executives, officers, directors, and employees helped Nygard cover up his crimes and continued to facilitate and enable his crimes so that they would receive financial benefits and career advancement.

159.    These upper-level executives, officers, and directors knew or should have known, through the exercise of reasonable diligence, of Nygard's use of company funds and resources to engage in and cover-up sexual misconduct. Yet, they did nothing to stop or deter him, in violation of their fiduciary duties to the Nygard Companies, Nygard Companies' employees, and the public.

160.    In 1980, Nygard was arrested for rape, but the charges were later dropped when the girl accusing him decided not to testify against him. Nygard used funds from the Nygard Companies to pay the woman's family off so that the girl would not testify against him.

161.    Over the course of decades, scores of female employees of the Nygard Companies have also accused him of sexual improprieties. These stories share striking similarities and are well known throughout the Nygard Companies. Several examples are set forth below:

    a.    One woman was hired as a merchandiser for the Nygard Companies. She reported to the corporate Human Resources ("HR") Department that Nygard entered her hotel room, while they were on a corporate business trip, and raped her. A few hours after

she reported the incident to the Nygard Companies' HR Department, a company executive arrived at her door with a check for $8,000 and a non-disclosure agreement for her to sign.

b.  In 1995, another former female employee sued Nygard for having sex with her "against her will." Nygard and the Nygard Companies reached an undisclosed settlement with the former employee that required her to sign a nondisclosure agreement.

c.  Another female employee reported that she was forced to stand next to Nygard at a meeting with company executives present. During the course of the meeting, Nygard rubbed his foot up and down the woman's thigh while the Nygard Companies' executives watched. Many former employees have described similar stories during company meetings.

d.  In 1996, the Winnipeg Free Press wrote a front-page story detailing Nygard's sexual misconduct and relating to interviews with seven former and current female employees of the Nygard Companies. Three female employees filed sexual harassment complaints with the Manitoba Human Rights Commission against Nygard and the Nygard Companies. In that year alone, the Nygard Companies paid out $20,000 in settlements over sexual assault claims by female employees (the equivalent of hundreds of thousands today).

e.  The Nygard Companies' former communications manager reported that she would frequently walk into meetings with Nygard, and find him fondling himself with his pants down. On one occasion, she reported that she was instructed to open a closet door to get something and she found a box full of pornographic photos of Nygard with

various women. She reported Nygard's conduct to the Human Rights Commission, and received a $6,000 payoff from the Nygard Companies.

f. The same employee was responsible for hiring a woman that became Nygard's next target. Nygard regularly made sexual advances towards her at work in front of other employees and executives of the Nygard Companies. She reported Nygard's conduct to the Human Rights Commission, and the Nygard Companies paid her $8,000.

g. Another female employee of the Nygard Companies reported that she walked into Nygard's office and he was stroking his genitals at his desk. When the woman turned away, Nygard dropped his pants and began masturbating while looking at her. She reported Nygard's conduct to the Manitoba Human Rights Commission and the Nygard Companies paid her $4,500.

162.    Former employees of the Nygard Companies have also stated that Nygard equipped the Nygard Companies offices in Winnipeg, Toronto, and Marina Del Rey with hidden rooms that he used as "sex dens." The existence of these rooms was common knowledge among employees of the Nygard Companies.

163.    In fact, Nygard was convicted in a Toronto jury trial on November 12, 2023 of sexually assaulting four different women in such a "sex den" in the Toronto office.

164.    Rather than create a professional work environment for female employees, the Nygard Companies' HR department, functioned to cover-up his rapes, sexual assaults, and molestations of company employees and other woman who were brought to the corporate offices under false pretenses of modeling and other career opportunities. The corporate HR Department regularly paid off Nygard's accusers and forced them to sign non-disclosure agreements so Nygard could continue his pattern and practice detailed herein.

B.    **Defendants Engaged in A Pattern and Practice of Sex Trafficking Due, in Part, to Their Intimidation and Corruption Tactics.**

*Bahamian Culture, Political Corruption, and Nygard's Power in the Bahamas.*

1.    **Sexual Crimes are Drastically Under-Reported in the Bahamas Due to Weak Laws that are Poorly Enforced.**

165.    In 2007, the Bahamas had the highest rate of reported rapes in the world, and, in 2016, it had the highest incidence of rape per capita in the Caribbean.[34] The United Nations Woman narrative on gender-based violence in the Caribbean found that the worldwide average for rape was 15 per 100,000 people, while the Bahamas has an average of 133 per 100,000 people.[35]

166.    Global estimates are that between 60 and 95 percent of sexual crimes go unreported and that even those reported are unlikely to be prosecuted. Rape is the most underreported violent crime.[36]

167.    Rape is particularly underreported in the Bahamas due to a culture of stigmatization, victim shaming, government corruption, and weakly-enforced laws. For example, in 2013, the Bahamas Crisis Centre in New Providence alone counselled 122 new clients for rape and 42 for sexual assault, while, during that same period, the police recorded only 104 rapes for the entire country. During the same time period, data from Princess Margaret Hospital's

---

[34] United Nations Office on Drugs and Crime and the Latin America and the Caribbean Region of the World Bank, "Crime, Violence, and Development: Trends, Costs, and Policy Options in the Caribbean" (March 2007), *available at* http://www.unodc.org/pdf/research/Cr_and_Vio_Car_E.pdf.

[35] Khrisna Virgil, Bahamas Has Worst Total In Region For Rapes, The Tribune (Feb. 16, 2016), *available at* http://www.tribune242.com/news/2016/feb/16/bahamas-has-worst-total-region-rapes/.

[36] Heather Sutton, IDB Series on Crime and Violence in the Caribbean: Crime and Violence in the Bahamas, June 2016, at 34-25, available at https://publications.iadb.org/en/publication/12508/crime-and-violence-bahamas-idb-series-crime-and-violence-caribbean.

emergency room alone shows it treated nearly 1.5 times the number of country-wide rapes reported to the police.[37]

168.    In 2018, only 55 rapes were reported in the Bahamas, while Cleveland, Ohio, which has a similar population size, had 585.[38]

169.    The local word for rape in the Bahamas is "hush." It is not discussed or spoken of as a societal problem.

170.    In 2018, the State Department issued a travel advisory warning that "sexual assault is common" in the Bahamas and advising tourists to exercise caution.

171.    Rapes in the Bahamas also have very low police-clearance rates. On average, the percentage of rape cases solved between 2010 and 2013 was 40 percent. This means that rapes are highly unlikely to be prosecuted, which does little to stimulate better reporting.[39]

172.    Another reason why sex crimes are so widely under-investigated and prosecuted in the Bahamas is because violence against women and girls is often seen as a private matter, in which the State should not interfere. A culture of acceptance interrelated with strong patriarchal gender norms is prevalent, which can lead to failures in response by law enforcement.[40]

173.    Due, in part, to these factors, scores of Nygard rapes and sexual assaults in the Bahamas have gone unreported over the past three decades.

---

[37] *Id.*; Royston Jones Jr. 711 rapes presented to hospitals since July 2013, Eyewitness News (Mar. 13, 2019), *available at* https://ewnews.com/711-rapes-presented-to-hospitals-since-july-2013.

[38] Kim Barker, How a Neighbors' Feud in Paradise Launched an International Rape Case, The New York Times (Feb. 22, 2020), *available at* https://www.nytimes.com/2020/02/22/world/americas/peter-nygard-louis-bacon.html?referringSource=articleShare

[39] *Id.*

[40] Human Rights Council, Report of the Special Rapporteur on violence against women, its causes and consequences, on her mission to the Bahamas, at 4 (May 25, 2018), *available at* https://undocs.org/en/A/HRC/38/47/Add.2.

2.     **Political and Government Corruption Is Widespread in the Bahamas.**

174.    Political and governmental corruption is "rooted in the fabric of Bahamian society."[41] The government has laws to combat corruption of and by public officials, but they are inconsistently applied.[42]

175.    According to one survey, despite one in ten Bahamians disclosing that they had been forced to pay a bribe within the past year to obtain public services, few reported the corruption to law enforcement. According to the survey, almost half were too scared of the consequences— such as potential retaliation and victimization—to report allegations of bribery by public officials. Fear is a major obstacle to stamping out a problem that the Bahamian Prime Minister recently estimated costs the Bahamian economy approximately $200 million per year.[43]

176.    For this reason, few people in the Bahamas (approximately 6%) actually report corruption when they experience it. Overwhelmingly, the survey showed that of those who reported an incident of corruption to the authorities—***not one*** respondent stated that the authorities took action against the government officials involved. This is despite the evidence showing that one in eight Bahamians (approximately 13%) who had contact with the police in the year prior to October 2017 had paid a bribe in order to get services they needed.[44]

177.    Bribery in the courts was also reported, with one in ten people who came into contact with the courts having paid a bribe in the previous twelve months, demonstrating that there

---

[41] Neil Hartnell, Not a Single Bribe Demand is Probed, The Tribune (Apr. 26, 2018), *available at* http://www.tribune242.com/news/2018/apr/26/not-a-single-bribe-demand-is-probed/.

[42] The Bahamas – Corruption, Global Security.org, *available at* https://www.globalsecurity.org/military/world/caribbean/bs-corruption.htm.

[43] Neil Hartnell, Not a Single Bribe Demand is Probed, The Tribune (Apr. 26, 2018), *available at* http://www.tribune242.com/news/2018/apr/26/not-a-single-bribe-demand-is-probed/.

[44] *Id.*

is still an acute corruption risk in this key law and order institution (10%). The findings indicate how corruption is undermining the rule of law and public safety in the Bahamas, in addition to the Bahamians' inability to police its borders and determine who can reside in the country.[45] Corruption has become "a cultural element of the mindset of Bahamians[,]" and "[i]t's rooted in the fabric of society."[46]

178.    Additionally, the Royal Bahamas Police Force scored an unwanted first by becoming the first police organization in the Caribbean to rank top for both receiving bribery payments and being perceived as the country's most corrupt public institution. As a result, Bahamians are unwilling to report corruption and other crimes to law enforcement because they don't trust the police.[47]

179.    Nygard routinely boasted to the women at Nygard Cay that he bribed and paid off the police, leaving his victims in fear that the police would not act if they reported what Nygard had done to them.

---

[45] *Id.*

[46] *Id.*

[47] *Id.*

180.    Nygard routinely hired Bahamian policemen for "personal security," which furthered his victims' mistrust of the police. Below is a photo of Bahamian policemen at Nygard Cay.



181.    Due to the low police clearance rates for investigations of sexual crimes and the cultural attitude toward sexual crimes and the victims of such crimes, victims of sexual crimes in the Bahamas rarely pursue their claims. They are ashamed and embarrassed, fear retaliation and victimization, rightfully do not trust law enforcement to pursue and prosecute their attackers, and do not trust the court system to provide them with justice.

### 3.    Nygard has Significant Power and Influence in the Bahamas, Resulting from His Widespread Bribery and Bahamian Political Contributions.

182.    During the time-period relevant to this action, Nygard was well known in the Bahamas as one of the wealthiest and most influential individuals with a home there.[48] He has also spent significant money, provided by the Nygard Companies, to bribe Bahamian officials including, without limitation, law enforcement, and to gain political influence and power on the island through political contributions.[49]

183.    Nygard's political connections in the Bahamas go as far back as the 1980s when he paid government officials to provide him with the property where he built his Nygard Cay estate. In the early 1990s, Nygard paid members of the Progressive Liberal Party ("PLP") for help relating to his Nygard Cay property and expansion plans. In 1992, Nygard wrote to then minister of agriculture, Perry Christie ("Christie"), regarding a "significant" pledge he had made, asking for help relating to the expansion of his property, and stating "this whole world is based on one hand helping the other and you know that I am prepared to do whatever is in my capacity to help out the Bahamas and the PLP party and of course yourself in any way I can."

184.    Nygard's long relationship with the PLP and its leader, Christie, continued for decades. Christie eventually became the Prime Minister of the Bahamas from 2002-2007. The PLP and Christie, however, lost the 2008 election to the rival political party, the Free National Movement ("FNM").

---

[48] *See, e.g.*, Peter Nygard To Sponsor Independence Regatta, You Tube (Jul. 6, 2013) *available at* https://www.youtube.com/watch?v=n6KOtR4G37U; https://www.youtube.com/watch?v=d55fJKf8zsA

[49] *See, e.g.*, Nygard Reacts to Criticism, You Tube (Jul. 15, 2013), *available at* https://www.youtube.com/watch?v=zKFjnnHXDGs; International Environmentalists Visit Nygard Cay, You Tube (Jan. 30, 2015), *available at* https://www.youtube.com/watch?v=ih55gjHvEp8.

185.    Nygard made significant financial contributions, using the Nygard Companies' funds, and efforts in order to help the PLP and Christie regain power in the Bahamas by winning the 2012 election.[50]

186.    Nygard contributed at least $10 million (in U.S. or Bahamian currency) to get Christie elected and paid to have individuals spread bad press about the FNM. He also paid $300 to each person who would vote for the PLP in the 2012 election. Nygard was thus able to successfully help Christie get elected for a second term (2012-2017), in exchange for political favors and influence.

187.    Nygard and Christie were in regular contact with one another before, during, and after the 2012 election.[51] Nygard regularly invited political figures, such as Bahamian Parliament members including, without limitation, Shane Gibson, Dion Foulkes, and police officers such as Royal Bahamas Police Superintendents Allan Emmanuel, Stephen Dean, and Wendall Deveaux, to attend his "pamper parties." As stated by the Nygard ComCor department, which answers exclusively to Nygard, the photograph below describes "Mr. S. Gibson" as attending and pictured at a "pamper party" in 2014 (according to sources, this is either Shane Gibson or his brother, Eric Gibson).

---

[50] *See* Khrisna Virgil, Mp: Concerns That Nygard 'Donated $5m To The Plp', The Tribune (Jul. 18, 2013), *available at* http://www.tribune242.com/news/2013/jul/18/mp-concerns-nygard-donated-5m-plp/; Khrisna Virgil, Nygard Admits Backing Plp in Sworn Affidavit, The Tribune (Jul. 23, 2013), *available at* http://www.tribune242.com/news/2013/jul/23/nygard-admits-backing-plp-sworn-affidavit/.

[51] *See, e.g.*, Fresh Questions Over Las Vegas Trip For Pm, Gibson And Nygard, The Tribune (May 5, 2017), *available at* http://www.tribune242.com/news/2017/may/05/fresh-questions-over-las-vegas-trip-pm-gibson-and-/.



Mr. S Gibson ;-) ;-)

Upload IP
Address          65.75.69.75

Dec 1, 2014, 5:57 PM

188.    Nygard provided PLP party members, including Shane Gibson and corrupt police officers, with children and young women for commercial sex acts in exchange for favors for Nygard. Nygard also provided some of his "girlfriends" to Bahamian politicians and police officers for sexual gratification. Nygard did so to gain influence with these politicians and law enforcement officials, as well as to gain compromising information about them in order to exert his influence over them.

189.    For example, former Playboy Playmate, Anna Nicole Smith, was a "girlfriend" of Nygard from approximately 1999-2002.[52] Nygard "gifted" Anna Nicole Smith to Shane Gibson,

---

[52] *See* https://www.whosdatedwho.com/dating/peter-nygard-and-anna-nicole-smith.

who later resigned from his position as Immigration Minister after photographs surfaced of him in bed with Anna Nicole Smith.[53]

190.    On another such occasion, one of Nygard's "girlfriends" was sent by Nygard to Perry Christie's office to "ask for help" with a personal matter. When she arrived, Christie had "sexy" photos of her, that she had taken for Nygard, spread across his desk. Christie took his penis out and attempted to engage in sexual activity with this woman, who refused. Afterwards, Nygard asked about his "girlfriend's" encounter with Christie and became upset when he learned that she did not have sexual intercourse with Christie.



191.    On September 5, 2012, shortly after the 2012 election, Prime Minister Christie and other high-ranking members of the PLP visited Nygard at Nygard Cay.

---

[53] *See* Bahamas Official Resigns Over Photos With Anna Nicole Smith, KLTV (Feb. 19, 2007), *available at* https://www.kltv.com/story/6107637/bahamas-official-resigns-over-photos-with-anna-nicole-smith/.



192.    Nygard also hosted high-ranking PLP officials at his Nygard Cay property to celebrate the PLP election victory in 2012, including the following, without limitation: the Minister of Housing & National Insurance, Shane Gibson; the Minister for Grand Bahamas, Dr. Michael Darville; the Minister of Education, Jerome Fitzgerald; the Minister of Agriculture, Alfred Gray; the Minister of Housing & Environment, Ken Dorsett; the Minister of Health, Dr. Perry Gomez; and the Director of Fertility, Dr. Wan Song.[54]



---

[54] *See* https://www.youtube.com/watch?v=Pw1xUXQNeIg; *see also* Nygard PLP 2012, You Tube (Mar. 23, 2016), *available at* https://www.youtube.com/watch?v=jVfw9LOSOZo.

193. Bahamian Parliament member and PLP member, Shane Gibson, was paid approximately $94,131.10 before the general election in 2012 and into 2013. The funds were deposited directly to his bank account in the United States, and the payments were made with funds from the Nygard Companies. Shane Gibson could not explain why the funds were deposited in an offshore U.S. bank account, as opposed to his bank accounts in the Bahamas.[55]



194. Eric Gibson, who is Shane Gibson's brother, was also on Nygard's "payroll" and was paid directly by the Nygard Companies, acting as a conduit to covertly funnel money between Nygard and the PLP. Nygard instructed his ComCor employees to have a check ready for Eric Gibson every week, even though he did not appear to provide any work for Nygard. Pat Smith, a PLP loyalist with close connections to Perry Christie also acted as a conduit to covertly funnel

---

[55] Rashad Rolle, Nygard Gave Gibson $94,000: $5,000 A Month Paid to Minister's US Bank Account, The Tribune (Apr. 24, 2017), *available at* http://www.tribune242.com/news/2017/apr/24/nygard-gave-gibson-94000-5000-month-paid-ministers/.

money to the PLP and was provided with regular payments from the Nygard Companies "per PJN"

(Peter J. Nygard, as demonstrated here:

















195.    Nygard was also close with then Deputy Prime Minister Phillip "Brave" Davis ("Davis")[56] and regularly met with him at Viking Hill and paid bribes to him and his political aides. Nygard met Davis through one of his former "girlfriends" who also was a former girlfriend of Davis.

196.    Davis allegedly introduced Nygard to known Bahamian gangsters and convicted criminals, Livingston "Toogie" Bullard and Wisler "Bobo" Davilma.[57] Nygard paid "Toogie" and "Bobo" with funds from the Nygard Companies to intimidate anyone who spoke out against him or his initiatives by, among other means, directing them to firebomb his detractors' vehicles and/or businesses, instructing them to threaten to kill those who oppose him, and commit other acts of violence and intimidation.[58]

197.    Recordings captured Nygard discussing illicit activity with Toogie and Bobo including, among other things, committing acts of violence against others and setting up covert meetings with Bahamian officials.[59]

198.    Nygard used his political connections and bribes to successfully gain building permits and to receive other favorable treatment including, without limitation, overlooking his illegal activities.

---

[56] Davis is now the elected Prime Minister of the Bahamas.

[57] *See* Ava Turnquest, Court documents claim Deputy PM sent criminals to protect Nygard's interests, Bahamas Local.com (Mar. 11, 2016), *available at* https://www.bahamaslocal.com/newsitem/147536/Court_documents_claim_Deputy_PM_sent_criminals_to_protect_Nygards_interests.html; https://www.youtube.com/watch?v=xCa9LEJsg2I (Nygard berating his security guard, Leo Thurston).

[58] *See* Ava Turnquest, Peter Nygard 'Hired Hitmen': Court Documents Detail Alleged Murder Conspiracy, The Tribune (Mar. 10, 2016), *available at* http://www.tribune242.com/news/2016/mar/10/claim-nygard-hired-hitmen/.

[59]           *See*           https://www.youtube.com/watch?v=qN4Xwu5hpAw&feature=youtu.be https://www.youtube.com/watch?v=0_LrErjvyaQ&feature=youtu.be

199.    In the months leading up to the general election of May 2012, many politicians visited Nygard Cay to receive cash for their campaigns. Nygard's strategy was to fund the government so that they would support his initiatives.

200.    Nygard had Bahamian police officers on his "payroll," and they frequently visited Nygard Cay, including Royal Bahamas Police Chief Superintendent, Solomon Cash, Superintendents Allan Emmanuel, Stephen Dean, and Wendall Deveaux, and Royal Bahamas Police officer, Camela McCoy. He used them to help "bury" reports of sexual abuse, supply information regarding ongoing investigations into his sex crimes, trace the whereabouts of people who crossed him, and intimidate, threaten to arrest, and otherwise harass his victims to ensure that they would not come forward. Nygard often alludes to the fact, in front of his "girlfriends," that he is powerful enough in the Bahamas to have people killed without being investigated.

201.    Indeed, when Nygard learned of the investigation of his illegal conspiracy and/or sex trafficking venture, he engaged lawyers to facilitate bribery payments to top Bahamian police officials to get more information that would enable him to attempt to bribe victims or intimidate them into silence.

202.    Nygard also regularly bribes Bahamian officials with U.S. currency from the Nygard Companies to prevent customs from searching his plane, prevent customs from checking the passports of the young women onboard, and to prevent customs from inspecting the passengers' luggage. This allows Nygard to traffic his victims to and from the Bahamas, transport drugs intended for his victims, and transport other supplies for "pamper parties" in the Nygard Companies' plane to avoid paying customs.

203.    Nygard does the same with the Nygard Companies' boats and regularly transports supplies and victims for his "pamper parties" from Florida to the Bahamas.

204.    In addition to politicians, government officials, and police, Nygard also paid for favorable media coverage and propaganda in the Bahamas to help further his agenda, silence his victims, and perpetuate Defendants' conspiracy and/or sex trafficking scheme. Prominent Bahamian media personalities, such as Phillipa "Lady" Russell, Carlos Mackie, Wendall Jones,[60] Sherman Brown,[61] Carvel Francis, and Steve McKinney, were frequent visitors to Nygard Cay and were on Nygard's payroll to obfuscate, smear, deflect, and distort the truth.

205.    Nygard's Bahamian victims have been previously unable to come forward to report his illegal activity and pursue their claims against him for several reasons including, without limitation, cultural stigmatization, shame, weak laws that are rarely enforced, low clearance rates for sexual-assault investigations, corrupt law enforcement and government officials, fear of Nygard's wealth, power, and influence in the Bahamas, and psychological manipulation and intimidation tactics used by Nygard, including the commonly held belief that Nygard has bribed government officials, police, and the media.

### 4. Nygard Also Has Considerable Influence in the United States, Canada, and Elsewhere.

206.    In addition to Nygard's political power in the Bahamas, Nygard and the Nygard Companies also boast of his "extensive political leverage" in the United States and Canada, and tout his relationships with "many high profile dignitaries" including "Governor General Ray Hnatyshyn, Prime Minister Brian Mulroney, Prime Minister Jean Chrétien, President Gorbachev

---

[60] Ava Turnquest, Journal's Publisher in Smear Campaign, The Tribune (Oct. 11, 2018), *available at* http://www.tribune242.com/news/2018/oct/11/journals-publisher-smear-campaign/.

[61] Nico Scavella, Sherman Brown Faces Prison after being Found Guilty of Contempt, The Tribune (Dec. 24, 2015), *available at* http://www.tribune242.com/news/2015/dec/24/sherman-brown-faces-prison-after-being-found-guilt/.

of the USSR, President Mauno Koivisto of Finland, Sha Lin – Mayor of Shanghai, President

Vicente Fox of Mexico, President George Bush Sr., & Prime Minister Pindling of the Bahamas."[62]

207.    Former President George H.W. Bush stayed at Nygard Cay and provided Nygard

with a jacket with the President's seal on it.



208.    Nygard had considerable influence in Canada and was recognized with awards by

politicians in Winnipeg and Toronto.  He "received the prestigious Queen Elizabeth II Golden

Jubilee medal for helping to 'create the Canada of today, and to recognize Mr. Nygard for

outstanding and exemplary achievement to Canada as a whole.'"[63]

---

[62] https://web.archive.org/web/20160313072707/http://corporate.nygard.com/larger-than-life/
[63] *Id.*

209.    Nygard was also given the key to the City of Winnipeg and had considerable influence within the Winnipeg police department.[64]



210.    Nygard's wealth, political connections, and power and influence in the Bahamas, Canada, and the United States helped perpetuate Defendants' conspiracy and/or sex trafficking venture by preventing the victims, Defendants' employees, and other witnesses from reporting his illegal conduct.

## C.    Defendants Engage in a Continuing Conspiracy and Uniform Pattern and Practice of Rape, Sexual Assault, Sexual Battery, Molestation, and Sex Trafficking, Using the Nygard Companies' Resources and Brand, for the Benefit of Themselves.

211.    Defendants engage in a continuing conspiracy and uniform pattern and practice in which they knowingly benefitted from participation in the conspiracy to recruit, lure, and entice children and women, in which they knew or should have known, that means of force, fraud, and coercion would be used, or that the child had not yet attained the age of eighteen years, to cause

---

[64] Joyanne Pursaga, Mogul's key to the city could be rescinded, The Winnipeg Free Press (Feb. 27, 2020), *available at* https://www.winnipegfreepress.com/local/moguls-key-to-the-city-could-be-rescinded-568266372.html.

the victims to engage in a commercial sex act, to include but not limited to rape, sexual assault, sexual battery, molestation, and/or sodomy. Methods employed by Nygard to commit sex trafficking include, but are not limited to, the use of physical force, threatening physical force, drugging victims, kidnapping or forcible confinement, threatening psychological or financial harm, promising lucrative modeling opportunities, promising other career opportunities, providing money, confiscating his victim's passports, and preventing exit from the Nygard Cay, Marina Del Rey, and other properties.

212.    Nygard has targeted, and instructed his employees and associates to target, children and young women. He has frequently stated to those finding and recruiting new girls and women for him, "the younger, the better." Nygard primarily preys on young, vulnerable, and impoverished Bahamian girls because he knows that they will not report his crimes to law enforcement, particularly in a climate where it is well known that Nygard bribes government and police officials.

213.    Nygard also routinely targeted young aspiring models from the United States, Canada, and elsewhere. He uses the Nygard Companies' brand, his influence and power in the fashion industry, and false promises of modeling and other career opportunities with the Nygard Companies to lure them to his properties in, among other places, Marina Del Rey, New York City, Winnipeg, and Toronto to rape, sexually assault, sexually batter, molest, sodomize, and/or sex traffic them.

214.    Among other deviant acts, Nygard often sodomizes his victims and demands that they defecate on him, including in his mouth. He also requests that his victims urinate on him and demands that victims on their menstrual periods provide him their menstrual blood for consumption.

215.    Nygard often exposes his victims to pornography as part of his sexual pattern. Victims have described seeing every type of sexual act, to include but not limited to, pornography featuring defecation, urination, and bestiality.

216.    Due to the extreme deviant nature of Nygard's sexual conduct, his victims feel even more degraded, ashamed, and embarrassed than the typical sexual assault victim.

**5.    Nygard Uses His Nygard Cay and Marina Del Rey Properties to Further the Nygard Brand and Facilitate His Illegal Conduct.**

217.    In 1987, Nygard built a 150,000 square-foot compound on Lyford Cay in the Bahamas, which became known as "Nygard Cay." Nygard uses the property to host company "pamper parties" to promote the Nygard brand and facilitate his sex trafficking. Nygard Cay is registered in the name of Peter Nygard and is used to promote the Nygard Companies' brand and all construction or maintenance that occurs on the property is paid for by the Nygard Companies.

218.    Lyford Cay is a wealthy, gated community in the Bahamas. Upon entering Lyford Cay, there is a large security gate stationed with security personnel. Only those with permission may enter Lyford Cay. Not even police have the power to enter upon their own discretion.

219.    Once entrance to Lyford Cay is granted, there is an additional fortress-like gate surrounding the Nygard Cay property. Next to the gate and surrounding the entire property is a fence equipped with barbed wire.



220.    At the gate, there is a gate house with an office attached to it. The protocol for most "pamper parties" and often other guests who enter Nygard Cay is that they must "register" with ComCor by completing a form requesting personal information, including providing full names and contact information, often including address and details of their physique, and taking a headshot and a full-body shot, which is then added to the ComCor database attached to the visitor's name.

221.    Once they enter the property, no one at Nygard Cay is allowed to leave the property without Nygard's express permission. The security gate staff will not open the gate unless they are instructed to do so by Nygard himself. The walls of Nygard Cay are tall, equipped with barbed wire, and surround the entire property. The only way out, other than the main gate, is to swim through shark-infested waters.



222.    Nygard also has a permanent residence and office of the Nygard Companies located in Marina Del Rey, California. Similar to his Nygard Cay property, the Marina Del Rey property is gated with security, and no one can leave without Nygard's express permission.

223.    Upon entrance to the Marina Del Rey property, all of Nygard's guests are similarly registered with the Nygard Companies' ComCor employees. They are required to provide their personal information, a full body shot, and head shot. This information is then saved to the ComCor database that is located on the same server as the database used at Nygard Cay.

**6.    Nygard Hosts Company "Pamper Parties" to Further the Nygard Brand and Facilitate His Illegal Conduct.**

224.    Nygard used fraud and deceit to knowingly recruit, lure, and entice children and women to his Nygard Cay and Marina Del Rey properties under the false pretense of attending weekly company modeling events known as "pamper parties" and promising, among other things, interviews for lucrative modeling opportunities when, in fact, he has no intention of fulfilling his empty promises.

225.    "Pamper parties" were held out by Nygard and the Nygard Companies as modeling events that are sponsored by the Nygard Companies.

226.    On the surface, young girls and women were invited to enjoy the amenities of the Nygard Cay and Marina Del Rey properties and were pampered for the day with free photo shoots, manicures, pedicures, and massages. These parties were intended, in part, to promote the Nygard brand and its products. They were promoted on the Nygard Companies' website and through corporate social media accounts. Females from the United States, Canada, the Bahamas, Jamaica, and elsewhere regularly attended "pamper parties."

227.    Nygard also used these "pamper parties" to facilitate and further his conspiracy and/or sex-trafficking venture. The atmosphere at the "pamper parties" was intended to impress vulnerable and impoverished children and young women, so that he could lure and entice his victims onto the Nygard Cay and Marina Del Rey properties with promises of modeling contracts and other opportunities to rape, sexually assault, sexually batter, molest, sodomize, and/or sex traffic them.

228.    Nygard regularly hosted "pamper parties" at the Nygard Cay and Marina Del Rey properties on Sundays when he was in each location with the hidden purpose of facilitating his crimes.

229.    In addition to massages, manicures and pedicures, gourmet food, and jet skis, "pamper party" attendees were encouraged to drink excessive amounts of alcohol (intentionally made extra strong, per Nygard's instructions)—and were sometimes unknowingly drugged—so that they were compliant for Nygard when he sought to sexually prey on them.



230.    Generally, only females were permitted to attend the "pamper parties," and all

attendees had to be on a special list kept by Nygard's ComCor. Examples of correspondence with

ComCor follow:

**Bahamas ComCor**

Yea u can bring as many guests as u like as long as they are your size or smaller and they have to be female

Nov 28, 2014, 10:48 PM

Can I bring any guest? 1 maybe 2 people

Nov 28, 2014, 10:42 PM



**Bahamas ComCor**

no men are allowed unless they come in a car with 5 females sexy females :-)

Sep 12, 2014, 3:17 PM

231.    Nygard's ComCor employees searched social media platforms for girls to attend the "pamper parties." Only females that met Nygard's sexual specifications of being slim bodied and beautiful are added to the list. Nygard has also described the females he desires as an "eight in the face and nice toilet." Other girls that do not meet this qualification are turned away at the security gate.

232.    A "toilet" is a slang phrase used by Nygard when he was referring to a female's buttocks.

**Bahamas ComCor**

there is a criteria to be slim - i just want to avoid any problems at security

Jan 10, 2016, 6:23 PM

**Bahamas ComCor**

but pls remember - slim pretty girls :) ;)

Jan 23, 2016, 1:14 PM

**Bahamas ComCor**

I am inviting you cause you are pretty and sexy and we have many friends in common that attends or have attended our parties in the past...

Mar 5, 2015, 8:06 PM



Pardon

Mar 26, 2015, 2:26 PM

**Bahamas ComCor**

Boned *

Mar 26, 2015, 2:10 PM

**Bahamas ComCor**

I have a question that I hate aasking but I have to. ...are your guest same size as you or smaller? They won't be let in if they are big bonded

Mar 26, 2015, 2:09 PM

**Bahamas ComCor**

Hey Darriel I will add however, I have to ask are your guests no bigger than a size 5..my boss unfortunately has a size requirement. (/_ \ )(/_ \ )(/_ \ )

**Bahamas ComCor**

do you think you can make it?

Jul 5, 2015, 3:44 PM

**Bahamas ComCor**

Nygard wants to pick and see the best today

Jul 5, 2015, 3:44 PM

233.    ComCor employees were specifically instructed by Nygard not to inquire about the ages of the "pamper party" attendees. Attendees were told that there is no requirement to show ID when entering the "pamper parties."

Kool so 1 last question will I need a I'd to get in?

May 8, 2015, 3:49 PM

**Bahamas ComCor**

no you dont :)

May 10, 2015, 1:22 PM

234.    When "pamper party" invitees were hesitant to attend because they know Nygard's true intentions, Defendants' ComCor employees were told to lure and entice them with promises of "rewards."



235.   Upon arrival at the gated Nygard Cay and Marina Del Rey properties, each of the potential victims was required to "register" with the Nygard Companies' ComCor, which was in charge of planning and coordinating corporate events, by providing their personal information, including their name, phone number, email address, and the identity of the person who invited them. Potential victims were also required to pose for a headshot and a full-body photograph. The pictures and registration forms were scanned and emailed directly to Nygard, using the Nygard Companies' resources, so that he could review who was in attendance from his bedroom.

236.   The information is then entered into a database so that Nygard has a ready list of "prospective recruits," *i.e.*, potential victims to pursue both during and after the pamper party. The database contains information and pictures of more than 7,500 girls, dating back to 1987. The

database was hosted on a corporate server and was maintained by the Nygard corporate IT department.

237.    The Nygard Companies' ComCor was used to keep track of, make contact with, and recruit, lure, and entice potential victims to the Nygard Cay and Marina Del Rey properties through the database.

238.    Nygard instructed these company-paid employees to call potential victims to invite them to "pamper parties," transport girls to and from the "pamper parties," or to otherwise pay for their transportation.

239.    Nygard's ComCor also used corporate social media accounts to post about "pamper parties" and send direct messages to potential victims that meet Nygard's specifications to invite to "pamper parties." The Nygard Companies' ComCor recruited these victims for Nygard and were paid by the Nygard Companies, with funds routinely routed through New York.



240.    Nygard's employees and "girlfriends" were also required to contact potential victims in the database.

241.    Nygard instructed his corporate ComCor to lure and entice potential victims to "pamper parties" by implying that potential modeling opportunities for the Nygard Companies were available:



**Bahamas ComCor**

yes and that you have to be sexy pretty and slim due to the fact that we will be scouting for models ...

Mar 6, 2015, 2:56 PM

███████████

Is the only restriction that only women are allowed?

Mar 6, 2015, 3:47 AM

███████████

I messaged Bianca earlier but didn't get a response so I can give you the names

Jun 13, 2015, 9:00 PM

███████████

Hey ,you can put me down and three friends

Jun 13, 2015, 8:58 PM

**Bahamas ComCor**

Im not sure if you saw the ads yet - but we have a SLIMS STORE opening in the mall at marathon - we are looking for slims models at the pamper party tomorrow - let me know if your interested in coming - or just to enjoy the party :)

Jun 13, 2015, 8:55 PM

**Bahamas ComCor**

Most def

Jun 13, 2015, 9:23 PM

███████████

Wait I can model too [?]?

Jun 13, 2015, 9:21 PM

**Bahamas ComCor**

are you bringing anyone?

Jun 13, 2015, 9:17 PM

Bahamas ComCor

you can invite as much female guests as you like however they have to look as hot as u due to the fact that we normally look for models for upcoming clothing lines..

Mar 6, 2015, 8:45 PM



242.    The sole purpose for contacting these young women and children, however, was to ensure that Nygard has a sufficient pool of potential victims.



243.    Nygard also coerced his other employees and "girlfriends" to recruit young females to attend the "pamper parties." They were required to provide a steady supply of sex partners for Nygard and would recruit children and young women at shops, clubs, and restaurants. In the Bahamas, Nygard specifically instructed them to target poor and vulnerable children and young women from the Bahamian ghettos so that he could more easily exploit these victims. [65]

244.    Nygard Companies' employees at the Nygard Cay and Marina Del Rey properties were required to "recruit" new victims for him. If they failed to provide an adequate pool of easily exploitable victims, Nygard punished them by forcing them to engage in sex acts with him, verbally berating them,[66] inflicting psychological abuse, docking pay, and/or forcing them to do manual labor. In stark contrast, those who provide Nygard with victims were paid extra by the Nygard Companies, and they are able to avoid his wrath and avoid being his sexual victim. Many of Nygard's employees and "girlfriends" were required to "recruit" new victims to avoid these punishments, be in his good graces to avoid further victimization, and receive rewards.

245.    If Nygard wished for a more intimate affair, he would have ComCor invite a victim to a dinner party at his residence.  This occurred in all of his locations, to include New York and Marina Del Rey.

246.    Once Nygard's potential victims enter the Nygard Cay and Marina Del Rey properties, the gates were locked and patrolled by security at all times. No one was allowed to leave the properties without express permission from Nygard.

---

[65] Kim Barker, How a Neighbors' Feud in Paradise Launched an International Rape Case, The New York Times (Feb. 22, 2020), *available at* https://www.nytimes.com/2020/02/22/world/americas/peter-nygard-louis-bacon.html?referringSource=article.

[66] *See, e.g.*, https://www.youtube.com/watch?v=xCa9LEJsg2I (Nygard berating security guard, Leo Thurston); Kai Falkenberg, Peter Nygard Answers to No One, Forbes (Nov. 18, 2010), *available at* https://www.forbes.com/forbes/2010/1206/features-peter-nygard-sexual-harassment-answers-to-no-one.html#236f0e30bc9b.

247.    Nygard has a preference for young girls and prefers underaged victims. Nygard has been known to say "18 is middle-aged, and 25 is an old woman."

248.    After he selected his victims for the night, Nygard, either himself or through his groomers, encouraged the children and young women to drink wine, "happy juice," or other alcoholic beverages.

249.    If the young girls or women were resistant, he sometimes had his bartenders lace the victims' drinks with drugs such as Rohypnol—colloquially referred to as the "date rape drug" or "roofies."

250.    Nygard then lured the victims to his bedroom or has them ushered there by groomers,[67] often under the false pretense of discussing a potential modeling contract in private, where he uses physical force or coercion or knowing the victim has not attained the age of eighteen years, to engage in commercial sex acts, and caused them to engage in unwanted commercial sexual acts.

251.    In the Bahamas, Nygard's personal security guard often stood outside the door to his bedroom, so that nobody could enter and so that his victims could not leave.

252.    After each encounter, the victim could not leave Nygard Cay without Nygard's personal permission, further extending the victim's horror and humiliation.

253.    Nygard Companies' employees often arranged for transportation to drive victims away from the properties once they were permitted to leave.

254.    Nygard rated or graded his victims based upon their looks and their sexual performance and entered those ratings or grades in his victim database for future reference.

---

[67] Kim Barker, How a Neighbors' Feud in Paradise Launched an International Rape Case, The New York Times (Feb. 22, 2020), *available at* https://www.nytimes.com/2020/02/22/world/americas/peter-nygard-louis-bacon.html?referringSource=articleShare.

255.    Nygard often paid the victims by giving them United States currency drawn from the Nygard Companies' bank account(s).

256.    The amount of money provided to the victims was sometimes more than most of his victims have seen at one time in their entire lifetimes.

257.     In addition to United States currency, Nygard promised that this money is just a start to what he can provide for the victims. He promised many victims that he would contact them about future modeling contracts.

258.    However, in the vast majority of cases, Nygard never intended to follow through with the modeling contracts and told his victims this for the sole purpose of maintaining control over them.

259.    If he did provide any modeling opportunities, it was for the purpose of raping, sexually assaulting, sexually battering, molesting, sodomizing, and/or compelling additional commercial sex acts from them.

260.    Nygard also threatened the victims with implied or express threats of retribution if they told anyone about what happened, often implying or expressly threatening to have his victims killed if they did not cooperate.

261.    Nygard typically did not knowingly target the same victims more than once.

262.    For those victims that Nygard did attempt to contact again, however, it was only to engage in additional commercial sex acts. Nygard, through company employees paid by the Nygard Companies, contacted those victims whom he gave "high ratings" and attempts to get them to attend future pamper parties. He used a combination of his wealth, influence, power, and the victims' socioeconomic vulnerabilities to turn the victims into his full-time sex workers. Nygard's

full-time sex workers were forced to act as his personal servants, satisfy his demands for sex acts, and "recruit" new victims for him to engage in commercial sex acts with.

7. **Nygard Used the Nygard Companies' Brand, Resources, and Influence and Power in the Fashion Industry to Lure and Entice Victims to the Nygard Companies' Corporate Offices and Other Properties Where He Raped, Sexually Assaulted, Sexually Battered, Molested, and Sex Trafficked the Victims.**

263.    At all relevant times to this Complaint, in addition to using "pamper parties" to lure and entice his victims, Nygard also used the Nygard Companies' brand, resources, and influence and power in the fashion industry to lure and entice victims to the Nygard Companies' corporate offices, "executive suites," and other properties in Marina Del Rey, New York City, Vancouver, Montreal, Winnipeg, and Toronto.

264.    Nygard had apartments and/or "executive suites" attached to or near the Nygard Companies' corporate offices in California, New York, Winnipeg, and Toronto. Nygard also had offices that he had converted to bedrooms at the Nygard Companies' office buildings. Nygard often lured and enticed young aspiring models and other young women to these properties with false promises of modeling and/or other career opportunities.

265.    Nygard used the Nygard Companies' resources to transport young women to these locations. The women believed they were traveling to the Nygard Companies' offices and/or properties for job interviews for modeling and other career opportunities.

266.    In truth, they were transported to the Nygard Companies' offices and/or other properties for the sole purpose of facilitating and enabling Nygard to rape, sexually assault, sexually batter, molest, sodomize, and/or sex traffic them.

267.    Upon their arrival, the victims were further duped into believing that they were attending job interviews for the Nygard Companies. Employees of the Nygard Companies often ushered the victims into a waiting area and offered to get them a beverage, while they waited for

Nygard. On some occasions, victims were served alcohol, or beverages that were laced with drugs to ensure the victims' compliance.

268.    Nygard then arrived and ushered the victim into what she believed was his office. At each Nygard Companies facility, the offices contained bedrooms. Nygard closed the door behind the victim and prevented them from leaving. He then forced or coerced the victim into commercial sex acts and/or raped, sexually battered, molested, sexually assaulted and/or sodomized her.

269.    Another method that Nygard routinely used to rape and sexually assault his victims was to offer aspiring models to stay at his "executive suites" and/or other properties while they traveled to the Nygard Companies to interview for modeling jobs. Nygard did not disclose that the "executive suites" and/or other properties are actually his personal apartment and/or room.

270.    Once inside, Nygard's victims were not permitted to leave without his permission. He raped and sexually assaulted them, sometimes for days at a time.

271.    As set forth in the section that follows, Nygard turned some of his victims into full-time sex workers, which he referred to as his "girlfriends," by continuing to promise lucrative modeling opportunities as well as providing financial benefits such as cash, clothing, jewelry, and travel on his global fashion tours. For those he could not turn into his "girlfriends," Nygard threatened them with express or implied threats of physical harm, career sabotage, and/or legal action.

272.    High-ranking employees of the Nygard Companies have direct knowledge that Nygard used the Nygard Companies' brand, resources, and position in the fashion industry to facilitate and enable the rape, sexual assault, sexual battery, molestation, sodomy and sex trafficking of young women who were seeking career opportunities with the Nygard Companies.

273.    These employees and others not only turned a blind eye to Nygard's criminal activity, but they also directly conspired with Nygard and/or participated in his sex trafficking venture in order to receive financial and other career benefits for themselves and the Nygard Companies.

**8.    Nygard Sex Trafficked His "Girlfriends" and in Some Cases, Forced Them to "Recruit" New Victims Using Company Resources for the Benefit of Nygard and the Nygard Companies.**

274.    Nygard referred to his full-time sex workers, as his "girlfriends" and his entourage of "girlfriends" that lived and traveled with him at any given time as his "harem."

275.    Nygard's "harem" consisted of women from the United States, Canada, Bahamas, and other countries. Some of his "girlfriends" are Bahamian victims who became his "girlfriends" after first being raped at "pamper parties."   Some were children as young as fourteen years old.

276.    Others were Canadian, American, and other nationalities that were lured and enticed into becoming Nygard's "girlfriends" by promises of modeling and other career opportunities with the Nygard Companies, or through the exploitation of their individual vulnerabilities.

277.    To perpetuate his playboy image for the benefit of the Nygard Companies, Nygard typically kept three to four of his "girlfriends" with him at all times, including during corporate events.

278.    They stayed with him and were forced to accompany him on trips or "tours" around the world on the Nygard Companies'-owned "N-Force" jet,[68] including, but not limited to

---

[68] Ilta Sanomat: Fashion Mogul's Plane will House a Sauna, Private Movie Theatre & a Disco, Nygard (Jul. 15,                              2005),                  *available*                  *at* https://web.archive.org/web/20181127124021/https://corporate.nygard.com/2005/07/15/ilta-sanomat-fashion-moguls-plane-will-house-a-sauna-private-movie-theatre-a-disco

California, New Orleans, New York, Toronto, London, Germany, Italy, and China. The Nygard Companies' "N-Force" jet contained mirrors on the walls and ceilings and was equipped with a bedroom and a stripper pole to facilitate and enable Nygard's sexual predilections, while traveling on official company business.

 

279.    Nygard kept tight and coercive control over his "girlfriends" through a variety of direct and indirect manipulation tactics, including threats of force, physical intimidation and abuse, verbal abuse, forced labor, withholding payment, and confiscating travel documents.

280.    Although Nygard continued to force and coerce his "girlfriends" to engage in commercial sex acts to satisfy his demands for sex, Nygard also used his "harem" of "girlfriends" to "recruit" or procure new victims for him to engage in commercial sex acts with.

281.    Nygard referred to his newly recruited victims as "fresh meat" or "sacrifices." Nygard expressed a desire for children and told his "girlfriends," who "recruit" for him, "the younger the better."

282.    If his "girlfriends" failed to provide Nygard with an easily exploitable victim each night, Nygard punished them by verbally berating them, inflicting psychological abuse,

withholding or cutting pay, forcing them to do manual labor, and forcing them to satisfy his perverse sexual desires.

283.    However, those who provided him with victims were paid extra for each victim and were also able to avoid his wrath.

284.    Nygard's "girlfriends" "recruited" his victims to avoid these punishments and to remain in his good graces, so they can receive rewards including, without limitation, any payments that Nygard may be withholding. Nygard's "girlfriends" also do so because they know that if they are able to "recruit" a new victim for Nygard, they will not be forced to satisfy his perverse sexual fetishes. Nygard's "girlfriends" have "recruited" victims to engage in commercial sex acts with Nygard in, among other places, the Bahamas, Miami, Texas, New York, Los Angeles, Canada, China, and Germany.

285.    Travel arrangements for Nygard's "girlfriends" were made through the Nygard Companies' corporate travel department. While on trips, Nygard's "girlfriends" were particularly vulnerable because they were in unfamiliar countries, entirely dependent upon Nygard for money and transportation, and he confiscated their travel documents.

286.    This method of luring and recruiting Nygard victims is precisely what the DOJ Indictment details, finding that Nygard and his co-conspirators used corporate travel employees of Nygard "to arrange interstate and international travel for 'girlfriends' and other victims." *See* Ex. 1 at ¶ 10(e).

287.    Nygard threatened to desert those of his "girlfriends" that did not follow his orders in foreign countries, where they would be left with no money or travel documents.

288.    Initially, Nygard's "girlfriends" were led to believe that they were traveling with him as models on glamorous fashion tours, or in furtherance of their future modeling careers.

Eventually, they learned that they were nothing more than full-time sex workers to Nygard that were forced to cater to all of his personal needs, including his constant demands for sex acts.

289.    Nygard's "girlfriends" did not have the choice to deny Nygard a demand for sex. When "girlfriends" have directly told him "no" to his sex demands, Nygard ignored the statement, forcibly disrobed them, and violently raped them instead.

290.    This method was designed to "teach" his "girlfriends" that saying no was not an option and saying "no" would result in a far more brutal, violent, and painful sexual attack.

291.    Nygard frequently took "girlfriends" to his New York City apartment once it was built, which was located near Times Square and was leased by the Nygard Companies.

292.    Nygard also regularly forced his "girlfriends" to accompany him to "swingers" clubs in New York City. While at the "swingers" clubs, Nygard forced his "girlfriends" to find couples for him to have sex with. He then paid and/or coerced his "girlfriends" to have sex with other men, while he watched and engaged in sex with the man's partner.

293.    While on official Nygard Companies' "tours," Nygard coerced his "girlfriends" to engage in forced labor for the benefit of the companies. Nygard's "girlfriends" were forced to be at his 'beck and call' and to cater to his every need 24 hours per day, 7 days per week. They were required to be awake every day at 5:30 a.m. to prepare his breakfast and ensure that it was ready for him to eat the moment he woke up. They were also required to, among other things, give him his medications on schedule, prepare his clothes, bathe him, clip his toenails, and prepare all of his meals.

294.    The "girlfriends" were required to prepare his bags with marketing and public relations materials for his business meetings relating to the Nygard Companies, attend his business

meetings, otherwise act as his personal servants, and to model company clothing for company executives—all of which directly benefitted the Nygard Companies.

295.     The "girlfriends" were expected to constantly go out and buy the tools of Nygard's trade in bulk: condoms, lubricant, and the Plan B abortion pills.

296.     Nygard's "girlfriends" were always paid varying amounts of cash in United States currency from the Nygard Companies to buy their compliance and silence. Nygard directed the Nygard Companies corporate accountant, Lili Micic, to make pay-offs to the "girlfriends" who threaten to go public with comprising information about him.



297.     Nygard's longtime "girlfriends" were also put on the official "girlfriend" or "model" company payroll. They were paid monthly through direct deposit with funds from a Nygard corporate account by the Nygard corporate accountant, Lili Micic. They were required to submit invoices that stated that they were being paid for "modeling and promotional services"—

even though they were full-time sex workers. These payments were made "per Mr. Nygard's request."

298.    Every payment from the Nygard Companies had to be directly approved by Nygard himself. The amount of payment was entirely conditioned upon their appearance and physique, their level of servitude to Nygard, their ability to satisfy his sexual desires, their willingness to engage in Nygard's perverse fetishes, and their ability to recruit new victims for him to engage in commercial sex acts with.

299.    Nygard, with the help of the Nygard Companies, used his financial resources, influence, power in the Bahamas, and psychological manipulation to intimidate his victims and ensure that his crimes were not reported.

300.    Those of his "girlfriends" who tried to leave him were harassed and threatened by Bahamian police or others that were on Nygard's payroll.

301.    Nygard has also paid people, using Nygard Companies' money, to intimidate his former "girlfriends" by slashing their tires, committing arson, threatening to have them arrested, and by having them followed.

**9.    Nygard Intentionally Used Fraud, Coercion, and Force to Cause and Bring About Commercial Sex Acts, Rapes, Sexual Assaults, Molestations, and Sexual Batteries Through the Nygard Companies' Resources.**

302.    Nygard's use of fraud, coercion, and force were "used to cause," or designed to bring about, the illegal sex acts.

303.    Nygard intended and was aware that the fraud, coercion, and force would cause rape, sexual assault, sexual battery, molestation, sodomy, and/or sex trafficking to take place with his victims.

304.    Nygard's goal, as evidenced by his uniform pattern and practice, was to recruit, entice, and lure either children, knowing that they had not attained eighteen years, or women. For the adult women, he would employ force, fraud and/or coercion to cause these victims to engage in commercial sex acts for which he, through the Nygard Companies, always provided something of value to the victim. The explicit or implicit *quid pro quo* was always intended for Nygard to receive a sex act.

305.    Nygard intentionally used the Nygard Companies' resources and brand as a tool in his sex trafficking endeavors to "coerce" his victims, by creating the atmosphere and belief that the victims were coming to a corporate event, a professional interview, or were being offered a modeling opportunity with Nygard Companies. The Nygard Companies, therefore, financed his commercial sex acts and facilitated and caused the rape, sexual assault, sexual battery, molestation, sodomy, and/or sex trafficking of his victims.

306.    The Nygard Companies also benefited from "pamper parties" and other corporate events,[69] which Nygard used to gain access to his victims, by promoting its brand and its products in the United States, Bahamas, Canada, and around the world.

307.    The Nygard Companies had actual knowledge that Nygard engaged in commercial sex acts with children and with young women by means of force, fraud, and/or coercion through Nygard—the founder, current chairman, and 100% owner of the companies.

308.    Other high-ranking employees of the Nygard Companies also have direct knowledge of Nygard's criminal activity. Other finance personnel, including the Nygard Companies' accountants, among others, knew or should have known about Nygard's illegal

---

[69] *See* ht7tps://ewnews.com/711-rapes-presented-to-hospitals-since-july-2013;

activity, because they were routinely sending tens of thousands of dollars per month in U.S. currency, without substantiation or controls, to Nygard.

**D.    Consistent with His Uniform Pattern and Practice, Jane Does Nos. 1-13 Were Raped, Sexually Assaulted, Molested, Sexually Battered, Sodomized and/or Forced to Engage in Commercial Sex Acts with Nygard by Means of Force, Fraud, and Coercion and/or Had Not Attained the Age of Eighteen Years.**

309.    In or about 2017-2018, **Jane Doe No. 1** was an employee of the Nygard Companies, primarily based in the office in Marina Del Rey, CA. Jane Doe No. 1 lived on Nygard's properties and traveled with him often. She was repeatedly sexually assaulted and battered by Nygard, and was threatened and coerced into having sex with Nygard in order to keep her job and receive her paycheck. Jane Doe No. 1 traveled with Nygard to New York City as an employee, and attended meetings at the Nygard Companies' offices and stayed at Nygard's apartment in New York City, where she was also forced and coerced to engage in commercial sex acts with Nygard. Nygard forced and coerced Jane Doe No. 1 to go to "swingers clubs" with him in Toronto and New York, where Nygard coerced her to have sex with other men so that Nygard could benefit by watching the affair for his own prurient interests and to achieve sexual climax. Nygard forced Jane Doe No. 1 to travel to Canada, where she was trapped without any means of returning home for months. While in Canada, Nygard gave Jane Doe No. 1 an ultimatum – either have sex with him or lose her job and housing. Under threat and coercion, Nygard had sex with Jane Doe No. 1. After she managed to return to the United States, Nygard continuously pressured Jane Doe No. 1 to participate in group sex acts and he "gifted" her to one or more of his friends to engage in commercial sex acts with those individuals without her consent. She was paid with U.S. currency from the Nygard Companies as compensation.

310.    In or about 2010, **Jane Doe No. 2** and a friend were invited to sit with Nygard and his "girlfriend" at their table for dinner in New York City at the W Hotel. Knowing this was part

of his scheme to deceive Jane Doe No. 2 into letter her guard down and could be used as leverage or payment to receive future sex acts, Nygard paid for the food and drinks. After drinks with Nygard's "girlfriend," Jane Doe No. 2 was invited to Nygard's Bahamian property. Once Jane Doe No. 2 arrived in the Bahamas, Nygard's "girlfriend," conspiring with Nygard, told Jane Doe No. 2 that Nygard wanted to have sex with her. Jane Doe No. 2 refused to engage in sex acts with Nygard. Nygard did not accept this and raped Jane Doe No. 2. After leaving the Bahamas, Nygard Companies employees continued to contact Jane Doe No. 2 for approximately a year, attempting to entice and recruit her to attend "swingers parties" hosted by Nygard.

311. In or about 2014, **Jane Doe No. 3** met Nygard when she was hired to model for the Nygard Companies' multi-day fashion show. The show took place during Superbowl weekend at the Nygard Companies' headquarters in New York's Times Square. On the final day of the fashion show, Nygard encountered Jane Doe No. 3 backstage and began rubbing her vagina without her consent. Jane Doe No. 3 also was at Nygard's residence in Time Square, where he served her champagne. Nygard trapped her on the balcony of his apartment, refusing to let her leave, and pushing his erect penis against her. Nygard propositioned her to have sex with him and offered her employment with the Nygard Companies as his "girlfriend" in exchange. When she refused to have sex with him, he told her she would regret not being his "girlfriend." Jane Doe No. 3 soon became dizzy. Nygard insisted that she drink more of the champagne he had served her, but she refused. Upon information and belief, the champagne was drugged. Nygard Companies employee called Jane Doe No. 3 a week after the assault to tell her that Nygard loved her, and they asked her to return to discuss additional opportunities, which she refused.

312. In or about 2007-2008, **Jane Doe No. 4** was recruited to Nygard's property by a modeling manager who conspired met and recruited her in New York City. Conspiring with

Nygard and the Nygard Companies, the model manager offered her a modeling opportunity with the Nygard Companies which would occur in the Bahamas.   Jane Doe No. 4 was told she would not be paid a salary, but the Nygard Companies would pay for her travel expenses, lodging, and food, and she would be given this career opportunity. Jane Doe No. 4 and the model manager flew on Nygard's private jet out of New York's LaGuardia Airport to the Bahamas, where they met Nygard. Nygard solicited Jane Doe No. 4 to become an assistant with the Nygard Companies. Despite hiring her as an assistant, he had her work for him for several months, but never paid her a salary for the work she did, despite numerous inquiries.  Once she was employed, he forced and coerced her to engage in sexual acts by threatening her, causing psychological harm, isolating her, and creating financial dependency.  He also attempted to have her recruit other victims, which she was able to avoid doing.  Jane Doe No. 4 received model opportunities, food, lodging, and trips on Nygard's private jet in exchange for the sex acts.

313.    In or about 2013 -2014, **Jane Doe No. 5** was brought to a club in New York City by Nygard and one of his "girlfriends." Both Nygard and the "girlfriend" sexually assaulted her, and Nygard raped her. During the rape, the "girlfriend" forcibly held Jane Doe No. 5's body down, so Nygard could continue raping her without deterrence.  The "girlfriend" stroked Jane Doe No. 5's hair, and told her, "It will be okay." The Nygard Companies paid Nygard's "girlfriend." The Nygard Companies paid for Jane Doe No. 5's transportation and admission to the club.

314.    In or about 2012, **Jane Doe No. 6** was working as a model and actress. A former co-worker recruited her to travel to New York to be photographed for the possibility of a modeling opportunity with the Nygard Companies. Jane Doe No. 6 travelled to New York.  After being photographed, Jane Doe No. 6 was selected to return and participate in the fashion show tour with the Nygard Companies. She was instructed by Nygard Companies employees to meet Nygard and

others at the W Hotel in Times Square, where the Nygard Companies paid for her room and board. On her second day in New York, Jane Doe No. 6 was told by a Nygard Companies employee that Nygard wished to meet her. When Jane Doe arrived at the meeting, Nygard was in a hotel room with several other women engaging in sexual acts. Jane Doe No. 6 did not want to participate and attempted to leave the room, but the door was locked. Nygard held Jane Doe No. 6 in the hotel room against her will and raped her. Following the rape, Nygard gave Jane Doe No. 6 a morning after pill and instructed her to take it. Nygard wanted to meet Jane Doe No. 6 again, but she refused, causing Nygard to become angry. Nygard Companies employees informed Jane Doe that if she refused to "meet" with Nygard, she would not be paid. Nygard arranged for Jane Doe No. 6 to be moved to a separate part of the hotel and forbid her from participating in the rest of the fashion tour. The Nygard Companies never paid Jane Doe No. 6 for the modeling work performed.

315.    In or about 2005, **Jane Doe No. 7** was an actress and an event planner. She met Nygard and was hired in the New York office of the Nygard Companies to organize swinger parties at night and was an assistant during the day. At a swinger's club in Toronto, without her knowledge or consent, Nygard made a "deal" with another man so that the man could have sex with Jane Doe No. 7 and Nygard could have sex with the man's partner. Without consent or warning, the man then penetrated Jane Doe No. 7 from behind after Nygard told the man she was agreeable to the arrangement.  Nygard admitted fault and apologized to Jane Doe No. 7. On a different occasion in 2011, also in New York, Nygard requested that Jane Doe No. 7 engage in sexual activity with him and two girls that appeared to possibly be underage in Nygard's New York City residence.  When Jane Doe No. 7 requested proof of age, this was refused.  Instead, one of the two girls, conspiring with Nygard, handed Jane Doe No. 7 a drink that was drugged.  She managed to escape the building before being raped by him.

316.    In or about 2005-2007, **Jane Doe No. 8** met Nygard through a colleague and was invited his residence at Marina Del Rey for a pamper party.  At the party, Nygard gave Jane Doe No. 8 a tour of his residence that ended in his bedroom and coerced Jane Doe No. 8 to engage in a sex act.  While in New York City in 2006, Jane Doe No. 8 was required to attend a "swinger's club" and engage in sex acts at Nygard's direction and against her will, for his prurient interest. Jane Doe No. 8 was required to engage in sex acts with Nygard, even if she did not consent to the sexual encounter.  On more than one occasion, Nygard forcibly raped Jane Doe No. 8, and forced sex acts upon her despite being told "no."  Nygard and the Nygard Companies offered Jane Doe No. 8 lodging, food, and travel in exchange for the sex acts.

317.    In or about 2005, **Jane Doe No. 9** met Nygard in the Bahamas after being invited to a "pamper party" and became one of Nygard's "girlfriends."  She was recruited and enticed to work for the Nygard Companies under the auspices of a legitimate job, which she worked until 2014. Jane Doe No. 9 was required to attend "swinger's clubs" and engage in sex acts at Nygard's direction for his prurient interest.  Jane Doe No. 9 was required to engage in sex acts with Nygard, even if she did not consent to the sexual encounter.  Jane Doe No. 9 was used in sex swaps with other men, including Nygard's best friend, Daniel Fitzgerald, and in exchange, Fitzgerald would bring Nygard another girl to "swap." Jane Doe No. 9 received money, travel, college tuition, lodging, and food in exchange for the sexual acts.

318.    In or about the fall of 2004 **Jane Doe No. 10** met Nygard in Marina Del Rey under the auspices of a model networking event hosted at Nygard's residence on the beach. To enter the property, Jane Doe No. 10 was required to go through ComCor at the front office and provide her identification, which was recorded. While leaving Nygard's Marina Del Rey home, Jane Doe No. 10 was approached by Nygard, who hugged her and asked her why she was leaving. Soon after

meeting Nygard in Marina Del Rey, Jane Doe No. 10 was offered an opportunity to represent his clothing line at an event in the Bahamas. Upon information and belief the Nygard Companies purchased Jane Doe No. 10 a one-way commercial plane ticket to the Bahamas. Upon arriving at Nygard's resort, Jane Doe No. 10 was escorted to a bedroom with her luggage and the door was closed. Nygard then entered the room and told her that they were going to have "so much fun," while groping her breasts and grabbing her body. Later that night, one of Nygard's "girlfriends" instructed Jane Doe No. 10 that if she did not do what Nygard requested sexually, then he was going to make it worse by beating her and raping her anally, which is what he had done to another young woman that had just left. During the evening, Jane Doe No. 10 began to feel out of sorts, because she had been drugged. While she was slipping in and out of consciousness, Nygard raped Jane Doe No. 10 multiple times throughout that night. Jane Doe No. 10 had no way to return home and when she approached Nygard in his office and asked for a plane ticket back to California, Nygard stated that she could not go because he had "purchased" her for his main "girlfriend" and refused to let her leave. Unable to leave or get help on the island, Jane Doe No. 10 was raped several more times by Nygard. Jane Doe No. 10 was also a witness to Nygard raping a woman that he claimed he was helping. Jane Doe No. 10 met Nygard's main girlfriend when she returned to the island. Nygard emotionally, verbally and sexually abused Jane Doe No. 10 while refusing her requests to return home. Jane Doe No. 10 was flown in Nygard's private plane to South Florida to a party then to New York, and at all times was watched over by Nygard or his main girlfriend. Jane Doe No. 10 had no funds and no way to return home, while she succumbed to threats and the tyranny of Nygard. Jane Doe No. 10 followed the rules created by Nygard, including instructions from on her clothing and hair. Jane Doe No. 10 remained fearful at the W Hotel in Times Square as staff and management of the hotel ignored her and served Nygard's every

demand, giving him complete privacy and dominion at the hotel property, as she and at least one other woman were held under his control and sexually assaulted.

319.    In or about 2007, **Jane Doe No. 11** was working as a model and met Nygard through professional contacts in California. Nygard offered Jane Doe No. 11 a modeling opportunity for the Nygard Companies and paid for her to fly to New York City on Defendants' private jet.  The Nygard Companies booked her a room at The W Hotel. While she was sleeping in her hotel room, Nygard entered without permission in the middle of the night. When Jane Doe No. 11 was not compliant with his sexual demands, Nygard began screaming at her.  The W Hotel never came to the room to ensure that Jane Doe No. 11 was safe. While in the room, Nygard sexually assaulted Jane Doe No. 11 by forcing oral sex upon her and forcing her to perform oral sex on him.  Jane Doe No. 11 was visibly distraught and upset when she left.

320.    In or about 2010-2011, **Jane Doe No. 12** was invited to meet Nygard under the false pretense that she was meeting Nygard for a professional opportunity.  The Nygard Companies arranged transportation for Jane Doe No. 12 to The W Hotel. She went up to the penthouse and saw that Nygard had security outside the door, which Jane Doe No. 12 understood meant that Nygard was controlling who could leave the room. Once inside, Nygard sexually assaulted Jane Doe No. 12 by digitally penetrating her without consent and against her will. She managed to flee and escape, even though the door was guarded by security.

321.    In or about 2008, **Jane Doe No. 13** met Nygard in the Bahamas after being invited to a "pamper party" and became one of Nygard's "girlfriends."  She was recruited and enticed to work for the Nygard Companies under the auspices of a legitimate job, which she worked until 2014. Jane Doe No. 13 was required to attend "swinger's clubs" and engage in sex acts at Nygard's direction for his prurient interest.  Jane Doe No. 13 was required to engage in sex acts with Nygard,

even if she did not consent to the sexual encounter. Jane Doe No. 13 was used in sex swaps with other men, including Nygard's best friend, Daniel Fitzgerald, and in exchange, Fitzgerald would bring Nygard another girl to "swap." Jane Doe No. 13 received money, travel, lodging, and food in exchange for the sexual acts.

### E. The W Hotel New York – Times Square Was Negligent in Protecting its Patrons, Including Jane Does Nos. 1-13.

322.    For decades, sex traffickers and their accomplices have brazenly operated in and out of hotels. Criminals parade their misconduct openly on hotel properties throughout the United States while the hospitality industry continues to allow them to use their properties, their rooms, and facilities for criminal activity, while they profit at the expense of human life, human rights, and human dignity.[70]

323.    Hotels are the chosen venue for sex traffickers to carry out the foregoing, as many offer a sanctuary for traffickers to operate in plain sight without penalty or action on the part of the establishment to curtail or hinder trafficking on their premise.

324.    In the United States, as much as 63% of all trafficking incidents happen in hotels ranging from luxury to economy.[71]

325.    While the hospitality industry should be the first to report concerning events and observations, some hotels prioritize profits over the safety and welfare of their patrons. The W Hotel is one such establishment.

326.    The W Hotel is a for-profit hotel and/or public lodging establishment which imposes a legal duty to take action to protect its patrons.

---

[70] *Human Trafficking and Hotels & Motels*, THE POLARIS PROJECT, https://polarisproject.org/ human-trafficking-and-hotels-motels/.

[71] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015).

327.    But aside from their duty to patrons and guests on their property, such as Jane Doe Nos. 6, 10, 11, and 12, The W Hotel has a heightened obligations to protect their guests from known or anticipated dangers, which includes human trafficking and other illegal activity.

328.    As with banking regulations that are geared to dismantle and counter terrorism networks, nationwide campaigns recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue, and took initiative as early as 1997 with the United Nations Blue Heart Campaign and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[72]    Despite the two campaigns releasing online resources and toolkits and making them publicly accessible to any entity concerned with human trafficking the hotel industry continued to look the other way while benefitting from what they knew or should have known were commercial sex acts of a minor or of an adult and induced by force, fraud, or coercion.

329.    Congress was well aware that disrupting human trafficking operations required removing profit incentives of businesses that provide necessary elements and resources to accomplish the acts defined in both 18 U.S.C. §§ 1591(a) and 1593A namely: recruiting, enticing, harboring, providing, transporting, obtaining, advertising, maintaining, patronizing, and/or soliciting.

330.    Despite ample education much of the private sector, particularly lodging, transportation, financial and technology sectors, have delayed implementing internal policies that would identify trafficking related benefits and remove them from their bottom line.[73]

---

[72] *DHS Blue Campaign Five Year Milestone*, DEPARTMENT OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.

[73] *Jane Doe 1 v. JP Morgan Chase Bank, N.A.*, 22-cv-10019 (JSR) (S.D.N.Y. 2022); *Jane Doe 1 v. Deutsche Bank*, 22-cv-10018 (JSR) (S.D.N.Y. 2022)

331.    From check-in to check-out, there are numerous indicators that traffickers and their victims exhibit during their stay in a hotel. With proper training and the implementation of reasonable security measures, hospitality companies could prevent and curtail the benefits they derive from the use of their premises for recruiting, enticing, harboring, providing, transporting, obtaining, advertising, maintaining, patronizing, and/or soliciting by what they knew or should have known were commercial sex acts of a minor or of an adult and induced by force, fraud or coercion, or a scheme to sexually assault and exploit guests.

332.    Although it is undoubtedly a company's responsibility to ensure it and its agents, contractors and employees are following the law, many hotel operators, like The W Hotel, choose to knowingly look the other way while facilitating and deriving proceeds from a conspiracy or venture that is causing the sexual assault, sex trafficking, and exploitation of some of its' patrons.

333.    Nygard was a frequent patron of The W Hotel. Every time he would stay there, it would remain for several days at a time, and would rent out the entire penthouse suite.

334.    This is an action against, *inter alia,* The W Hotel's owners, operators, managers, controllers, employees, servants, franchisees and/or agents who knew or should have known, based on a combination of well-documented indicators, that sex trafficking and other criminal activity was occurring, and would continue to occur, on their hotel premises as a result of their misfeasance and nonfeasance.

335.    At all material times, The W Hotel, individually and/or by its respective actual or apparent agents, operators, servants, franchisees and/or employees aided, concealed, confined, benefitted and profited from sexual assault, sexual battery, rape, molestation, sex trafficking and other criminal activity that was occurring on the hotel premise.

336.    At all material times, The W Hotel, individually and/or by its respective actual or apparent agents, operators, servants, franchisees and/or employees harbored human traffickers on its premise and/or failed to rectify the foreseeable risks of sex trafficking and other criminal activity that were occurring and would continue to occur on the hotel premise.

337.    At all material times, The W Hotel, individually and/or by its respective actual or apparent agents, operators, servants, franchisees and/or employees failed to take steps to prevent dangerous conditions from existing on its hotel premise, failed to ensure its premise was safe and secure from criminal conduct and failed to report suspicious conduct, such as human sex trafficking at its hotel.

338.    As a result of The W Hotel's failure to act and their negligent operations as further outlined, The W Hotel allowed its hotel premise to be a vehicle for carrying out human trafficking, sex crimes and/or other unlawful conduct. While The W Hotel profited from the room occupancy, which included additional fees and increased property value, and/or food and beverage sales on site, as well as ATM fees, Plaintiffs were being exposed to continuous and repeated dangerous conditions as sex trafficking and sexual assault victims that resulted in confinement, bodily injuries, emotional distress, mental harm and anguish.

339.    At all material times, The W Hotel was on notice about the prevalence of sex trafficking and sex crimes at its hotel and The W Hotel failed to take adequate steps that would have prevented its occurrence.

340.    There are many signs of commercial sex acts being induced by means of force, fraud and coercion, some signs are obvious, others require a properly trained staff. Some examples of such signs are:

a.  an excess of sex paraphernalia (condoms, lubricant, lotion, restraints, etc.) in rooms,

b.  excessive body fluids on linens,

c.  excessive amounts of cash stored in the room,

d.  illegal drugs and drug paraphernalia in the room,

e.  the same person rents multiple rooms,

f.  declining room service for several consecutive days,

g.  a request for a room in a part of the hotel not visible to the front desk,

h.  significant foot traffic in and out of room(s),

i.  foot traffic at odd hours of the day,

j.  men traveling with multiple women who appear unrelated,

k.  multiple women or young people known to be staying in rooms for extended periods of time without leaving,

l.  bruises or marks from physical injuries,

m.  signs of fear and anxiety,

n.  guests screaming for help in private rooms,

o.  guests or visitors that appear to be under the influence of drugs or alcohol,

p.  guests arriving and/or departing with little or no luggage,

q.  person preventing another individual from speaking for themselves,

r.  guests or visitors that avoid eye contact,

s.  guests or visitors that are inappropriately dressed;

t.  guests or visitors that appear disoriented, disheveled, or unhealthy, or

u.  a person controlling another's identification documents;[74]

v.  person controlling meals, movement, means of transportation, communications, and/or funds.

341.  Consequently, hotels and motels can and should adopt policies and procedures to:

a.  train and educate their staff on the hotel industry's historical and current risks of benefiting financially or otherwise from acts that support many forms of human trafficking;

b.  prohibit employees, agents and contractors from joining in ventures that recruit, entice, harbor, transport, provide, obtain, advertise, maintain, patronize, and/or solicit when they know or should know those acts are for the purpose of commercial sex acts of a minor; or commercial sex acts of an adult induced by force, fraud or coercion;

c.  place warnings up at their establishment and institute compliance and oversight of operations to ensure that no benefits are derived by the business or any of its employees or agents from ventures that they knew or should have known are violations of Chapter 77 of the U.S. Code;

d.  make relevant human trafficking resources and education available to all patrons, investors, business partners, employees, contractors, and agents;

e.  ensure resources and educational materials are updated;

---

[74]  *Id.*, DEPARTMENT OF HOMELAND SECURITY, *Blue Campaign Toolkit*, available at: https://www.dhs.gov/blue-campaign/hospitalityindustry; *See also,* Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, THE INSTITUTE TO ADDRESS CRIMINAL SEXUAL EXPLOITATION, Villanova University School of Law (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.

f.  deter trafficking with visible postings on websites and at locations prohibiting employees from accepting funds tied to suspected trafficking activity;

g.  create an internal protocol to guide employees, agents and/or contractors to request assistance and to reach out for help if requested to do so by a victim;

h.  develop relationships with local resource providers and request updated educational materials and information to provide to staff who are likely to encounter potential trafficking victims;

i.  make zero benefit human trafficking information available in common areas and/or guest rooms to assist victims of human trafficking to recognize that is not lawful for lodging establishment and companies to benefit from their trafficking;

j.  create employee reporting obligations and protocols to alert law enforcement when suspicious activity is detected or observed; and

k.  maintain a working relationship with law enforcement and local service providers for the benefit of the community, patrons and guests.

342.  When the hospitality industry fails to create policies to end the practice of profiting from trafficking they increase the likelihood that victims will be trafficked through use of their resources and properties.

343.  Choosing or pretending to ignore the signs of human trafficking while engaging in a business venture of operating a lodging facility, renting rooms results in benefits from the recruiting, enticing, harboring, providing, transporting, obtaining, advertising, maintaining, patronizing, and/or soliciting victims of human trafficking. In so doing, they are enabling atrocities

against human life and human dignity to go unchecked and unreported and are complicit in allowing their establishment to host and facilitate sex trafficking.

344.    The following signs of sex trafficking existed that were readily observable, and upon information and belief, were observed, by hotel staff in relation to Nygard and the Nygard Companies:

a.  Nygard is a regular guest and is personally known to the staff at The W Hotel.

b.  Nygard's victims and "girlfriends" were to stand by the elevator while Nygard interacted with the staff. Nygard required his victims and "girlfriends" not to make eye contact with or communicate with hotel staff.

c.  Upon information and belief, not all of Nygard's guests were registered to the room, despite hotel policy to the contrary.

d.  Upon information and belief, hotel staff were instructed not to have contact with Nygard's "girls."

e.  Cameras in the lobby and common areas would have captured Nygard's victims and "girlfriends" avoiding behaviors.

f.  The Nygard Companies were paying for the hotel accommodations.

g.  Nygard had a well-known playboy image.  Combined with that, there was constant foot-traffic of new girls and/or young woman that came in and out of the hotel, went up to the penthouse suite, and shortly thereafter would leave. These girls and/or young woman were usually scantily clad.

h.  Nygard's room ordered copious amounts alcohol during his time there.

i.  Nygard refusing housekeeping during his stay.

j.  When Nygard vacates the premise, there are excessive amounts of condoms, sex paraphernalia, and/or bodily fluids on the linens in the rooms.

k.  When Nygard would request it, The W Hotel would cut off the phones to the penthouse suite to prevent his victims from being able to call out or seek help.

l.  Many girls were lured to the W Hotel under the false pretense that they were being given a modeling opportunity.  These girls would arrive excited, and leave upset after being raped.

m.  Some girls would attempt to flee the W Hotel after being locked in Nygard's room and/or raped or sexually assaulted.  These girls were scared, shaken, distraught, crying, or desperate.  Some appeared disheveled or disoriented.

n.  Nygard posted guards outside the door to prevent his victims from escaping until he was ready to let them go.

o.  Nygard would begin screaming at his victims when he was upset, which was at an extraordinarily high volume and intensity that should have caused any establishment to check on the guests for safety.  The W Hotel staff never intervened when they heard Nygard screaming at various victims.

p.  Some of the girls staying with Nygard were minors.  The W Hotel did not verify the age of anyone accompanying Nygard.

q.  Upon information and belief, hotel staff members knew that Nygard was engaged in sexual assault, sexual battery, rape, molestation, or sex trafficking of the girls and women—hotel guests—in his penthouse suite.

345.    In or about 2011, **Jane Doe No. 6** came to the W Hotel under the false pretense that she was meeting Nygard for a professional modeling opportunity.  Jane Doe No. 6 was brought to

103

Nygard's room by a Nygard Companies employee.  When inside the room, she found Nygard and several girls engaging in sexual activity.  When she tried to leave, the door was locked from the inside, preventing escape—this is not a normal feature of a hotel room.  Because of this, Jane Doe No. 6 could not escape and was raped by Nygard.  Jane Doe No. 6 was visibly distraught when she left.

346.    In or about 2006-2007, **Jane Doe No. 8** travelled with Nygard to New York and stayed in the penthouse suite with Nygard and other girls. Jane Doe No. 8 was required to engage in forced sex acts with Nygard that she did not consent to in The W Hotel.  While in The W Hotel, Nygard became enraged with her and the other girls, causing him to become enraged and began yelling at a high volume for an extended amount of time.  No one from The W Hotel came to find out of the penthouse suite occupants needed help or were in trouble.

347.    Between 2005 and 2011, **Jane Doe No. 9** was a guest at The W Hotel and arrived with Nygard and other women on one or more occasions.  Jane Doe No. 9 was required to engage in forced and/or coerced commercial sex acts with Nygard consent to in The W Hotel.  Nygard also had a local recruiter who would solicit and recruit girls frequently, creating foot traffic with new, scantily clad, young girls and women to the penthouse suite.  Nygard refused to allow the girls out of the suite without his consent, and he would not allow Jane Doe No. 9 or the other girls to speak to the hotel staff without permission.

348.    In late December 2004 and/or January 2005, **Jane Doe No. 10** was a guest at The W Hotel and arrived with Nygard and one of his "girlfriends."  She was forbidden to speak to or make eye contact with hotel staff. Despite being there for multiple days, housekeeping was prevented from coming in, multiple new victims came in and out of the hotel, creating foot traffic to and from the room.  She was raped and sexually assaulted by Nygard in his penthouse suite.

349.    At the end of 2007, **Jane Doe No. 11** was flown to New York by Nygard on his private jet for a modeling opportunity.  The Nygard Companies booked her room and she requested her own room.  Jane Doe No. 11 was awakened when Nygard entered her room in the middle of the night, despite the fact that the door should have been locked.  When Jane Doe No. 11 was not compliant with his sexual demands, Nygard began screaming at her in the middle of the night.  The W Hotel never came to the room to ensure that Jane Doe No. 11 was safe.  While in the room, Nygard sexually assaulted Jane Doe No. 11 by forcing oral sex upon her and forcing her to perform oral sex on him.  Jane Doe No. 11 was visibly distraught and upset when she left.

350.    In or about 2010-2011, **Jane Doe No. 12**, was invited to the W Hotel under the false pretense that she was meeting Nygard for a professional opportunity.  While in the room, Nygard sexually battered her by digitally penetrating her vagina.  Outside the door, Nygard had security posted to prevent her from leaving.  Jane Doe No. 12 was able to sneak out of the door and fled the hotel.  Despite appearing afraid, disheveled, and running from Nygard's penthouse suite, the W Hotel did nothing.

351.    Between 2008 and 2011, **Jane Doe No. 13** was a guest at The W Hotel and arrived with Nygard and other women on one or more occasions.  Jane Doe No. 13 was required to engage in forced and/or coerced commercial sex acts with Nygard consent to in The W Hotel.  Nygard also had a local recruiter who would solicit and recruit girls frequently, creating foot traffic with new, scantily clad, young girls and women to the penthouse suite.  Nygard refused to allow the girls out of the suite without his consent, and he would not allow Jane Doe No. 13 or the other girls to speak to the hotel staff without permission.

**F. Defendants Are Actively Destroying Evidence and Concealing and Diverting Assets in Order to Defraud Plaintiffs.**

352.    One day after the initial Complaint was filed in this matter, high-ranking executives of the Nygard Companies approached members of the corporate Information Technology ("IT") Department and instructed them, at Nygard's direction, to "clean up" the corporate website and remove public access to corporate social media accounts, including corporate webpages and videos promoting "pamper parties" that are cited in Plaintiffs' Complaint.

353.    It was not until almost two weeks after the Complaint was filed, and after the FBI served a subpoena on the Nygard entities, that the Nygard Companies finally issued an internal memo instructing their employees to preserve evidence relevant to Nygard's crimes.

354.    Even after the internal memo was issued, employees of the Nygard Companies were instructed by executives of the Nygard Companies to delete thousands of electronic files from the corporate computer systems. Richter Advisory Group, Inc. ("Richter") authored a report concluding that 10,488 electronic files were deleted after the internal memo was issued.

355.    The majority of the file deletions were concentrated among three users. Two of the users were corporate IT employees that would have known that files were not supposed to be deleted, pursuant to the internal memo. The third user was Greg Fenske ("Fenske"), a co-conspirator who knowingly enabled and facilitated Nygard's crimes and participated in Nygard's sex trafficking venture. Fenske deleted a total of 1,059 files on March 18, 2020—the exact date that Richter was appointed as bankruptcy receiver and Defendants lost autonomy over their computer systems. Nygard and his cohorts deleted thousands of files, including evidence of wire transfers of millions of dollars out of the corporate accounts. In the three weeks before Richter's appointment, Fenske had very little deletion activity, showing that his conduct was not routine. Fenske has continued to assist Nygard and is regularly conducting Nygard "business," along with

co-conspirator Biehare Agonafer, who continues to squat at Nygard's 1 Yawl Street property in Marina del Rey, California.

356.    Defendants, including Nygard, several Nygard Companies, and executives and accomplices, have been actively diverting and concealing assets in order to enrich Nygard and others, and defraud Plaintiffs and other creditors.

357.    In the Canadian receivership proceeding, Richter has been acting as the court-appointed receiver on behalf of the following Nygard-affiliated entities: Nygard Holdings (USA) Limited, Nygard Inc., Nygard NY Retail, LLC, Fashion Ventures Inc., Nygard International Partnership, Nygard Properties Ltd., Nygard Enterprises Ltd., 4093887 Canada Ltd, and 4093879 Canada Ltd.

358.    During that proceeding, Richter issued a series of reports detailing serious misconduct relating to the intentional diversion and concealment of assets. By way of example, the following were noted in the First Report of the Receiver dated April 20, 2020:

  a. Nygard conspirators intentionally diverting funds from a Nygard Company account to a California company controlled by Nygard called Edson's Investment Inc ("Edson's");

  b. On January 6, 2021, Acting United States Attorney Audrey Strauss submitted a letter to the Department of Justice, supplementing her January 5 letter that urges Nygard remain detained and providing additional details of recent major financial activity by persons and/or entities controlled by Nygard. The January 6 letter details the sale of some $70 million in California properties by "certain U.S. based entities controlled by Nygard," facilitated by Nygard and/or Nygard

Company associates. The relevant Nygard affiliates include Edson's Investments Inc. ("Edson's"), and Brause Investments Inc. ("Brause").

     i. Edson's is a U.S.-based Nygard Group entity controlled by Nygard with an ownership interest in the Marina Del Rey property and 14401 South San Pedro Street in Gardena, California. Edson's is a subsidiary of Nygard Properties Ltd. *Id.* Company and bank records also show that, prior to the Canadian bankruptcy proceedings, Edson's was intermingled with the Nygard Companies. Edson's, for example, provided funding to Nygard International Partnership, and company emails demonstrate that "Nygard controlled Edson's."

     ii. Brause is "another American Nygard Group entity controlled by Nygard" and is a subsidiary of Nygard Properties Ltd.

     iii. The recent property sales by Nygard-controlled entities, totaling nearly $70 million, include:

          a. 14702 South Maple Street, sold by 14702 South Maple Street LLC for $30,700,500 cash;

          b. 14401 S. San Pedro Street, sold by Edson's for $11,101,500 cash;

          c. 14421 S. San Pedro Street, sold by Edson's for $9,136,500 cash;

          d. 312 E. Rosencrans Avenue, sold by Brause for $7,290,000 cash; and

          e. 332 E. Rosencrans Avenue, sold by Brause for $9,684,000 cash.

c. Immediately after the receivership application was issued and the week before it was ordered, former Nygard executives and key co-conspirators, Tiina

Tulikorpi and Greg Fenske, charged over $186,000 in personal expenses on the Nygard corporate credit cards (after Fenske worked to raise the credit limits on those cards), including expenses for alcohol, prepaid cards, gas, auto repairs, groceries, electronics. $100,000 was diverted to pay Edson's expenses.

d.  Nygard disposed of dozens of corporate vehicles, including diverting at least one to co-conspirator, Tiina Tulikorpi. The receiver was unable to locate approximately 40 of the corporate vehicles.

e.  Abe Rubinfeld, general counsel of various Nygard Companies, sending threatening emails demanding access to Edson's property.

f.  Theft of corporate property by an insider, enabled by shutting down security systems.

359.   On information and belief, Nygard conspired to divert hundreds of millions of dollars to Tiina Tulikorpi to be moved offshore.

360.   On information and belief, Nygard is utilizing an attorney named Kenneth Morris in Colorado to handle various aspects of Nygard's ventures, including receiving checks for the 9450 Topanga Properties, LLC. Nygard's co-conspirator, Biehare Agonafer, acts as Morris's "legal assistant" and is also a conduit between Nygard and fellow co-conspirator and co-defendant, Gregory Alan Fenske.

361.   Moreover, as the criminal investigation of Nygard was heating up, on information and belief, Tulikorpi deposited extraordinarily large sums of cash in a Toronto account.

## CLAIMS ALLEGED

### COUNT I
### VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION ACT
### 18 U.S.C. §§ 1595(a), 1591(a), 1593A, and 1594(c)

362.    Plaintiffs reallege and incorporate by reference the allegations above as if fully set forth in this Count.

363.    This Count is brought on behalf of Jane Does Nos. 1-13 against Defendant Nygard and the Nygard Companies, and Tiina Tulikorpi.

364.    Defendants knowingly used the instrumentalities and channels of interstate and foreign commerce to facilitate violations of 18 U.S.C. §§ 1595(a), 1591(a), 1593A, and 1594(c), occurring within the territorial jurisdiction of the United States.

365.    Defendants' conduct was in or affected interstate and/or foreign commerce.

366.    Jane Does Nos. 1-13 were all adults at the times material to this Complaint.

367.    Defendants knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited Jane Does Nos. 1-13, individuals that they knew or should have known would be caused to engage in a commercial sex act, through the use of force, fraud, and/or coercion.

368.    Jane Does Nos. 1-13, did engage in commercial sex acts with Nygard or others at Nygard's direction, due to Nygard's use of force, fraud and/or coercion.

369.    Plaintiffs received something of value for engaging in sex acts; to-wit: they were provided or promised job opportunities, received cash, travel, lodging, food, and/or they were able to leave Nygard's property.

370.    Defendants Nygard and the Nygard Companies received something of value for engaging in sex acts; to-wit: Nygard, who is the alter-ego of the Nygard Companies, received the sexual experience, gratification, and (often violent) conquest he sought, as well as free labor when he did not pay models for the work performed.

371.    Plaintiffs are victims of a violation of Chapter 77 of Title 18 of the United States Code, to wit, 18 U.S.C. §§ 1595(a), 1591(a), 1593A, and 1594(c), perpetrated by Defendants, insofar as:

a. Defendant Nygard, and others acting in concert with him or conspiring with him knowingly recruited, enticed, harbored, transported, provided, obtained, maintained, patronized, and/or solicited Plaintiffs by multiple means to commit one or more commercial sex acts;

b. Defendants the Nygard Companies, and others acting in concert with them knowingly benefitted, financially or by receiving anything of value, from participation in a venture which Defendants knew or should have known has engaged in an act described in (a) in which Plaintiffs were the victims;

c. Defendants, and others acting in concert with them committed the acts described in (a) and (b) in which they knew or should have known that means of force, threats of force, fraud, coercion, or any combination of such means would be used to cause Plaintiffs to engage in one or more commercial sex acts.

372.    Plaintiffs are victims of a violation of Chapter 77 of Title 18 of the United States Code, to wit, 18 U.S.C. § 1591(d), insofar as Defendants, and others acting in concert with them obstructed, attempted to obstruct, and/or interfered with or prevented the enforcement against them of 18 U.S.C. § 1591 in connection with their actions of which Plaintiffs were the victims.

373.    The Nygard Companies were paid handsomely through the years for their work for Nygard.

374.    Defendants' violations of 18 U.S.C. § 1591, 1593A, and 1594(c), give rise to a cause of action under 18 U.S.C. § 1595, which has continued without interruption since Defendants' first activities related hereto.

375.    Defendants' conduct has caused and continues to cause Plaintiffs serious and permanent harm, including, without limitation, physical, nonphysical, psychological, financial, and reputational harm.

376.    Under the TVPRA, 18 U.S.C. § 1595, Plaintiffs are entitled to recover from Defendants damages and reasonable attorney's fees.

**COUNT II**
**RECEIVERSHIP**

377.    Plaintiff realleges and incorporates by reference the allegations above as if fully set forth in this Count.

378.    This Count is brought on behalf of Jane Does Nos. 1-13 against all Nygard, the Nygard Companies, and the individual Defendants (other than The W Hotel).

379.    As described above, all these Defendants named above have conspired to divert and conceal assets from creditors.

380.    The ongoing actions create an imminent danger of even more property being lost, concealed, injured, diminished in value, and/or squandered.

381.    Because of the vast network of co-conspirators and accomplices, and diversion of cash and other assets, Plaintiffs have no adequate legal remedies.

382.    The harm to Plaintiffs by denial of the appointment of a receiver would be greater than the injury to the parties opposing any such appointment, particularly since several of the defendants are already in receivership in Canada.

383.    Plaintiffs have a probability of success in this action. The United States Department of Justice has indicted Nygard for the sex trafficking enterprise described in detail herein and has stated that there are "hundreds of victims."

384.    Plaintiffs will suffer irreparable injury in their interests to the assets and property that will pay and secure any judgment herein.

<u>**COUNT III**</u>
**SEXUAL BATTERY IN VIOLATION OF CALIFORNIA CIVIL CODE § 1708.5 AND COMMON LAW**

385.    Plaintiffs reallege and incorporate by reference the allegations above as if fully set forth in this Count.

386.    This Count is brought on behalf of Jane Does Nos. 1, 9 and 13 against Defendant Nygard.

387.    Nygard intentionally committed sexual battery and/or intentionally caused other individuals to commit sexual battery on Jane Doe Nos. 1, 9 and 13 in violation of California law.

388.    Nygard acted with the intent to cause a harmful and offensive contact with an intimate part of Plaintiffs Jane Does Nos. 1, 9 and 13, and a sexually offensive contact directly or indirectly resulted.

389.    Nygard acted with the intent to cause a harmful and offensive contact with Jane Doe Nos. 1, 9 and 13, by use of his intimate part and a sexually offensive contact directly or indirectly resulted.

390.    Nygard also acted to cause an imminent apprehension or fear of a harmful and offensive contact with Plaintiffs Jane Doe No. 1's, 9's, and 13's intimate parts.

391.    Plaintiffs Jane Doe Nos. 1, 9 and 13 did not consent to Nygard's harmful and offensive contact and/or were coerced in to such harmful and offensive contact.

392.    Plaintiffs Jane Doe Nos. 1, 9 and 13 were harmed and/or offended by Nygard's conduct. Nygard's conduct has caused Jane Doe Nos. 1, 9 and 13 serious and permanent harm and/or damages, including, without limitation, physical, psychological, emotional, financial, and reputational harm, pain and suffering, loss of enjoyment of life, humiliation, and loss of consortium.

**COUNT IV**
**AIDING AND ABETTING IN VIOLATION OF CALIFORNIA LAW**

393.    Plaintiffs reallege and incorporate by reference the allegations above as if fully set forth in this Count.

394.    This Count is brought on behalf of Jane Doe Nos. 1, 9 and 13 against the Nygard Companies.

395.    Nygard intentionally committed sexual battery and/or intentionally caused other individuals to commit sexual battery on Jane Doe Nos. 1, 9 and 13 in violation of California law.

396.    Nygard acted with the intent to cause a harmful and offensive contact with an intimate part of Plaintiffs Jane Does Nos. 1, 9 and 13, and a sexually offensive contact directly or indirectly resulted.

397.     Nygard acted with the intent to cause a harmful and offensive contact with Jane Doe Nos. 1 and 9, by use of his intimate part and a sexually offensive contact directly or indirectly resulted.

398.    Nygard also acted to cause an imminent apprehension or fear of a harmful and offensive contact with Plaintiffs Jane Doe No. 1's, 9's, and 13's intimate parts.

399.    Plaintiffs Jane Doe Nos. 1, 9 and 13 did not consent to Nygard's harmful and offensive contact and/or were coerced in to such harmful and offensive contact.

400. Plaintiffs Jane Doe Nos. 1, 9 and 13 were harmed and/or offended by Nygard's conduct. Nygard's conduct has caused Jane Doe Nos. 1, 9 and 13 serious and permanent harm and/or damages, including, without limitation, physical, psychological, emotional, financial, and reputational harm, pain and suffering, loss of enjoyment of life, humiliation, and loss of consortium.

**COUNT V**
**CIVIL CONSPIRACY IN VIOLATION OF CALIFORNIA LAW**

401. Plaintiffs reallege and incorporate by reference the allegations above as if fully set forth in this Count.

402. This Count is brought on behalf of Jane Doe Nos. 1, 9 and 13 against Defendants Nygard and the Nygard Companies.

403. Defendants have participated in a continuing conspiracy to commit rape and/or sexual battery and to cover-up their conspiracy for over four decades.

404. Defendants formed a group of two or more persons and agreed to a common plan or design to commit tortious acts, including sexual assault and/or sexual battery.

405. All Defendants had actual knowledge that sexual assault and/or sexual battery was planned and concurred in the tortious scheme with knowledge of its unlawful purpose.

406. Defendants intended to aid in the commission of the planned tort, including sexual assault and/or sexual battery.

407. Defendants committed numerous wrongful acts, including sexual assault and/or sexual battery, against Plaintiffs Jane Doe Nos. 1, 9 and 13 occurring in the State of California pursuant to their agreement.

408.    The Nygard Companies also committed wrongful acts by knowingly luring and enticing Jane Doe Nos. 1, 9 and 13 to locations where Defendants knew Nygard would sexually assault and/or sexually batter them.

409.    The Nygard Companies also committed wrongful and/or overt acts by knowingly providing Nygard with the resources to sexually assault and/or sexually batter Jane Doe Nos. 1, 9 and 13.

410.    The Nygard Companies' employees carried out the acts and omissions constituting the alleged conspiracy within their actual or ostensible authority with the Nygard Companies.

411.    The acts and omissions of the Nygard Companies' employees were carried out in and during the course of their employment with the Nygard Companies.

412.    The Nygard Companies' employees conspired with Nygard because they believed that they would be rewarded with substantial career-advancing opportunities if they cooperated and agreed to Nygard's demands.

413.    This affirmative conduct of the Nygard Companies was committed by express and/or implied agreement that Nygard would use the Nygard Companies' money and brand, the promise of a modeling career, and his influence in the fashion industry to commit sexual assault and/or sexual battery against Plaintiffs Jane Doe Nos. 1, 9 and 13.

414.    In exchange for conspiring to facilitate and cover-up Nygard's sexual assault and/or sexual battery of Plaintiffs Jane Doe Nos. 1, 9 and 13, the Nygard Companies' employees progressed in their careers at the Nygard Companies and received financial benefits therefor.

415.    Conspiring with Nygard and covering up his sexual misconduct was a means of obtaining success and growth within the Nygard Companies' hierarchy.

416.    Plaintiffs Jane Doe Nos. 1, 9 and 13 were damaged as a direct result of Defendants' agreement.

417.    Defendants' conduct has caused Plaintiffs Jane Doe Nos. 1, 9 and 13 serious and permanent harm and/or damage, including, without limitation, physical, psychological, emotional, financial, and reputational harm, pain and suffering, loss of enjoyment of life, humiliation, and loss of consortium.

## COUNT VI
## ASSAULT AND BATTERY UNDER NEW YORK LAW

418.    Plaintiffs reallege and incorporate by reference the allegations above as if fully set forth in this Count.

419.    This Count is brought on behalf of Jane Doe Nos. 1, 3, 5, 6, 8, 9, 10, 11, 12 and 13 against Defendant Nygard.

420.    That the aforesaid occurrences and resultant injuries to these Plaintiffs were caused by reason of the intentional, carelessness and recklessness of Defendant Nygard, his agents, servants and/or employees, suddenly and without provocation did physically assault and batter Plaintiffs herein and did cause unwelcomed contact, causing the Plaintiffs to sustain damages; in that Nygard did conduct himself in a wanton, willful, reckless and heedless manner without regard for safety of the Plaintiffs herein; in that said Nygard was physically abusive; in behaving in a disorderly manner; in using unnecessary, excessive and unlawful touching against the Plaintiffs; and willfully and maliciously assaulting the Plaintiffs herein.

421.    Plaintiffs were damaged thereby.

<u>COUNT VII</u>
**CAUSE OF ACTION CPLR 213-c FOR CONDUCT CONSTITUTING
CRIMES UNDER PENAL CODE § 130**

422.    Plaintiffs reallege and incorporate by reference the allegations above as if fully set forth in this Count.

423.    This Count is brought on behalf of Jane Doe Nos. 1-13 against Defendant Nygard.

424.    §130.35 of the New York State Penal Law provides as follows: Rape in the first degree 1 A person is guilty of rape in the first degree when he or she engages in sexual intercourse with another person: 1. By forcible compulsion; or 2. Who is incapable of consent by reason of being physically helpless; or 3. Who is less than eleven years old; or 4. Who is less than thirteen years old and the actor is eighteen years old or more. NY CLS Penal § 130.35.

425.    § 130.50 of the New York State Penal Law provides as follows: Criminal sexual act in the first degree 1 A person is guilty of criminal sexual act in the first degree when he or she engages in oral sexual conduct or anal sexual conduct with another person: 1. By forcible compulsion; or 2. Who is incapable of consent by reason of being physically helpless; or 3. Who is less than eleven years old; or 4. Who is less than thirteen years old and the actor is eighteen years old or more. NY CLS Penal § 130.50.

426.    § 130.70 of the New York State Penal Law; "Aggravated sexual abuse in the first degree" provides that "A person is guilty of aggravated sexual abuse in the first degree when he inserts a foreign object in the vagina, urethra, penis or rectum of another person causing physical injury to such person.

427.    Defendant Nygard violated one or more of the above statutes.

428.    § 213-c of the Civil Practice Law and Rules provides as follows:

**§ 213-c. Action by victim of conduct constituting certain sexual offenses**
Notwithstanding any other limitation set forth in this article, except as provided in

subdivision (b) of section two hundred eight of this article, all civil claims or causes of action brought by any person for physical, psychological or other injury or condition suffered by such person as a result of conduct which would constitute rape in the first degree as defined in section 130.35 of the penal law, or rape in the second degree as defined in subdivision two of section 130.30 of the penal law, or rape in the third degree as defined in subdivision one or three of section 130.25 of the penal law, or criminal sexual act in the first degree as defined in section 130.50 of the penal law, or criminal sexual act in the second degree as defined in subdivision two of section 130.45 of the penal law, or criminal sexual act in the third degree as defined in subdivision one or three of section 130.40 of the penal law, or incest in the first degree as defined in section 255.27 of the penal law, or incest in the second degree as defined in section 255.26 of the penal law (where the crime committed is rape in the second degree as defined in subdivision two of section 130.30 of the penal law or criminal sexual act in the second degree as defined in subdivision two of section 130.45), or aggravated sexual abuse in the first degree as defined in section 130.70 of the penal law, or course of sexual conduct against a child in the first degree as defined in section 130.75 of the penal law may be brought against any party whose intentional or negligent acts or omissions are alleged to have resulted in the commission of the said conduct, within twenty years. Nothing in this section shall be construed to require that a criminal charge be brought or a criminal conviction be obtained as a condition of bringing a civil cause of action or receiving a civil judgment pursuant to this section or be construed to require that any of the rules governing a criminal proceeding be applicable to any such civil action.

429.    Defendant violated one or more of the above statutes.

430.    Plaintiffs were damaged thereby.

<u>**COUNT VIII**</u>
**NY GENDER MOTIVATED VIOLENCE PROTECTION ACT**
**N.Y. ADC. LAW §§ 8-904, 903**

431.    Plaintiffs reallege and incorporate by reference the allegations above as if fully set forth in this Count.

432.    This Count is brought on behalf of Jane Doe Nos. 1-13 against Defendant Nygard.

433.    N.Y. ADC. LAW § 8-903 states in relevant part "For purposes of this chapter: a. "Crime of violence" means an act or series of acts that would constitute a misdemeanor or felony against the person as defined in state or federal law or that would constitute a misdemeanor or felony against property as defined in state or federal law if the conduct presents a serious risk of

physical injury to another, whether or not those acts have actually resulted in criminal charges, prosecution, or conviction. b. "Crime of violence motivated by gender" means a crime of violence committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender."

434.    N.Y. ADC. LAW § 8-904 : NY Code – Section 8-904: Civil Cause of Action states in relevant part "Except as otherwise provided by law, any person claiming to be injured by an individual who commits a crime of violence motivated by gender as defined in section 8-903 of this chapter, shall have a cause of action against such individual in any court of competent jurisdiction for any or all of the following relief: 1. compensatory and punitive damages; 2. injunctive and declaratory relief; 3. Attorneys' fees and costs; 4. such other relief as a court may deem appropriate."

435.    Rape, sexual battery, sexual assault, molestation, sodomy, and sex trafficking would be considered crimes of violence motivated by gender.

436.    Defendant's conduct constitutes crimes of "violence motivated by gender" under The Victims of Gender-Motivated Violence Protection Act.

437.    Defendant violated the sections cited herein as set forth and Plaintiffs suffered damages as a result.

## COUNT IX
### NEGLIGENCE

438.    Plaintiffs reallege and incorporate by reference the allegations above as if fully set forth in this Count.

439.    This Count is brought on behalf of Jane Doe Nos. 6, 8, 9, 10, 11, 12, and 13 against Defendant Starwood Hotel and Suites Worldwide, Inc. ("Starwood"), doing business as The W Hotel.

440.    At all times material to this complaint, Plaintiffs Jane Doe Nos. 6, 8, 9, 10, 11, 12, and 13, while an invitee or otherwise lawfully present upon the premises of The W Hotel, did sustain injuries as a result of Nygard and the Nygard Companies' actions.

441.    Jane Doe Nos. 6, 8, 9, 10, 11, 12, and 13 were The W Hotel's respective patrons.

442.    Starwood, by and through its agents, employees, operators, managers and/or contractors, owed a duty to maintain the premises of The W Hotel property that it owned, operated, controlled, supervised and/or for which they were otherwise responsible, in a reasonably safe condition and free from conditions that would render it dangerous and unsafe for its lodging guests, and visitors to the property, to include Plaintiffs.

443.    Starwood, by and through their agents, employees, operators, managers and/or contractors, owed a duty to exercise reasonable care to protect Plaintiffs, by inspection or other affirmative acts, from the danger of any reasonably foreseeable harm occurring from the reasonably foreseeable use of the premises of The W Hotel that it owned, operated, controlled, supervised, and/or managed for which they were otherwise responsible.

444.    Starwood, by and through their agents, employees, operators, managers and/or contractors owed a duty to exercise reasonable care to keep the hotel guests of The W Hotel, including Plaintiffs, safe by implementing and enforcing security measures and proper protocols.

445.    Starwood, by and through their agents, employees, operators, managers and/or contractors owed a duty to safeguard the Plaintiffs against criminal conduct that The W Hotel could reasonably foresee happening at their property, caused by Nygard or the Nygard Companies.

446.    Starwood, by and through their agents, employees, operators, managers and/or contractors owed a duty to maintain The W Hotel in a hospitable, safe and reasonable manner.

447.   Starwood had actual or constructive knowledge of Nygard and the Nygard Companies' coerced sex trafficking, sexual assaults, and abusive behavior, carried out at this property on multiple occasions.

448.   Starwood knew or should have known, in light of all the attendant circumstances stated herein, that the risk of such criminal conduct taking place at The W Hotel would be unreasonably high without The W Hotel taking appropriate security, hiring and training precautions against such conduct as well as protocols for reporting and refusing benefits from such conduct.

449.   Starwood knew or should have known of the dangerous condition Plaintiffs were in at The W Hotel, or in the alternative, that the dangerous condition existed for a sufficient length of time that The W Hotel should have exercised ordinary care, should have known of the conditions, thereby had constructive knowledge of Plaintiffs' peril; and/or that the condition occurred with regularity at The W Hotel and was therefore foreseeable; and/or The W Hotel should have known of the dangerous condition or peril by conducting proper and reasonable inspection of the hotel premises and/or guests' and/or visitors' conduct.

450.   Because sex trafficking and associated conduct was foreseeable, Starwood had a duty to take adequate measures at The W Hotel to not profit from or enable harm to their guests, including Jane Does Nos. 6, 8, 9, 10, 11, 12, and 13, and should have refused any benefit from their sex trafficking, sexual abuse, and/or exploitation.

451.   At all times material, Starwood, by and through their agents, employees, operators, managers and/or contractors, created and/or allowed the dangerous condition to exist at The W Hotel and/or failed to keep Jane Doe Nos. 6, 8, 9, 10, 11, 12, and 13 safe while they were each on the premises of The W Hotel.

452.    Starwood could have taken any number of corrective measures to make the dangerous conditions at The W Hotel cease, including but not limited to:

    a.   not accepting payments for suspected criminal activity,

    b.   not renting rooms to known criminals or for criminal activity,

    c.   providing training regarding human trafficking and sexual assault awareness to employees, to include for how to identify individual signs of trafficking,

    d.   establishing, implementing and/or enforcing protocols on reporting suspected human trafficking or sexual assault and facts to police,

    e.   training employees to respond proactively to situations involving human trafficking or sexual assault; and

    f.   establishing, implementing and/or enforcing protocols on how to approach general emergency situations or manage criminal risks when a potential victim has been identified.

453.    In failing to take any measures to report and remove the dangerous conditions from the premises, Starwood failed to take reasonable care to protect Jane Doe Nos. 6, 8, 9, 10, 11, 12, and 13, their hotel guests.

454.    Starwood, by and through their agents, employees, operators, managers and/or contractors breached its respective duty owed to Jane Doe Nos. 6, 8, 9, 10, 11, 12, and 13, and was negligent by:

    a.   Creating and fostering a dangerous condition;

    b.   Failing to correct the aforementioned dangerous condition;

    c.   Failing to report and refuse renting to traffickers and/or accomplices;

    d.   Failing to properly and adequately maintain the premises in a reasonably safe condition;

    e.   Failing to monitor and prevent ongoing illegal sex and drug trafficking;

    f.   Failing to have security measures to protect the Plaintiffs;

    g.   Failing to provide training regarding human trafficking awareness to employees and staff,

    h.   Failing to provide training to employees on how to identify individuals who may be traffickers or their victims of trafficking or sexual assault;

    i.   Failing to establish, implement or enforce protocols on reporting suspected human trafficking and responding to situations involving human trafficking or sexual assault;

    j.   Failing to establish, implement or enforce protocols on how to handle general emergency situations or manage criminal risks, especially when a hotel guest may be in danger; and

    k.   Failing to take affirmative steps to investigate suspicious conduct and forbid criminal conduct.

455.    As a direct and proximate cause of the foregoing, Jane Doe Nos. 6, 8, 9, 10, 11, 12, and 13 were injured by Starwood's actions and has suffered psychological, emotional, and physical injuries, emotional distress, mental anguish, pain and suffering and the loss of enjoyment of life.

## **REQUEST FOR RELIEF**

Plaintiffs respectfully request that the Court enter judgment in their favor, and against Defendants, as follows:

a.    That the Court grant permanent injunctive relief to prohibit Defendants from continuing to engage in the unlawful acts and practices described herein;

b.    That the Court award Plaintiffs compensatory, consequential, general, and nominal damages in an amount to be determined at trial;

c.    That the Court award punitive or exemplary damages in an amount to be determined at trial;

d.    That the Court award to Plaintiffs the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

e.    That the Court award pre- and post-judgment interest at the maximum legal rate; and

f.    That the Court grant all such other relief as it deems just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all claims so triable.

Dated: November 23, 2023

*/s/ Greg G. Gutzler*
Greg G. Gutzler (State Bar No. 5375993)
**DiCELLO LEVITT LLP**
485 Lexington Avenue, Tenth Floor
New York, New York 10017
Tel:    (646) 933-1000
ggutzler@dicellolevitt.com
***Counsel for Jane Does Nos. 1-13***

Lisa D. Haba*
**THE HABA LAW FIRM, P.A.**
1220 Commerce Park Drive, Suite 207
Longwood, Florida 32779
Tel:    (844) 422-2529
lisahaba@habalaw.com
***Counsel for Jane Does Nos. 1-13***

* *Pro hac vice* pending

125